9.

# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

THE CHICAGO AND ALTON RAILROAD COMPANY

*v.*

NATHANIEL J. PILLSBURY.

*Filed at Ottawa November 11, 1887.*

1. CARRIERS OF PASSENGERS—*duty of carrier to provide for the safety of passengers, and to avoid dangers—and herein, in respect to dangers not usually incident to travel.* The carrier of passengers must omit no care to discover and prevent danger and injury to a passenger or passengers that is reasonable and practicable. The public exigency and security demand this much of the carrier, at all times and under all circumstances.

2. In regard to the selection of suitable machinery and cars, the fitness of the road, both as to manner of construction and materials used, and in the use of all appliances adopted for the government or moving of trains, and in regard to the selection and retention of competent and faithful servants, the carrier of passengers by rail is obligated to the highest reasonable and practicable skill, care and diligence. But as to dangers and perils not incident to any mode of travel, the rule of liability imposed on the carrier by law is less stringent.

3. In regard to danger and hazard to railway passengers arising otherwise than on the train, and not incident to such mode of travel, the degree of care to be observed to discover and prevent all danger to and consequent injuries to passengers, will depend largely on the attendant circumstances.

In many cases, if the carrier observes ordinary care and diligence to discover and prevent injury to passengers, it will be exonerated from liability. In other cases, and under different circumstances, it will be the duty of the carrier to exercise the utmost care, skill and diligence to protect the passenger, so far as the same may be done by the exercise of such care, skill and diligence, in respect to such dangers as can be reasonably and practicably foreseen in time to prevent injury.

4. SAME—*as to the danger of an attack upon a railway train by a mob of strikers—duty of the carrier as to the safety of passengers.* Where, by the exercise of ordinary care, danger to passengers on a train of cars may be anticipated from the attack of a mob of striking laborers upon laborers of another class, taken on board the train, it will be negligence to stop the train at a place not a regular station for stopping, and there take on such objectionable laborers, and thus expose other passengers to a great peril from a threatened attack, without taking the utmost care and vigilance to prevent injury to passengers. In such case the offensive persons against whom an attack was reasonably to be expected, should at least be placed in a car to themselves, where they might protect themselves without danger to the regular passengers, having no notice of the danger, or extraordinary precautionary measures should be taken to prevent the assault of the mob.

5. In an action by a passenger against a railway company, to recover damages for an injury caused by a wound from a pistol shot fired by some one of the mob attacking the car, which attack might, by ordinary care, have been expected, the court, on behalf of the plaintiff, instructed the jury, that it was the duty of the defendant, as common carrier of passengers, "to exercise the utmost care, skill and vigilance to carry plaintiff safely, and to protect him against any and all danger, from whatever source arising, so far as the same could, by the exercise of such a degree of care and vigilance, have been reasonably foreseen and prevented:" *Held*, that as applicable to the facts of the case, the instruction stated the law with sufficient accuracy.

6. SAME—*due and proper care as a question of law.* What degree of care a common carrier must observe for the safety of a passenger on its train of cars, to exonerate it from liability for personal injury to the passenger, is a question of law.

7. PRACTICE—*improper remarks of counsel to jury.* The manner of conducting an oral argument before the jury is so much in the discretion of the trial court, that this court will not interfere on account of the course pursued by counsel in the argument, unless it appears that manifest injustice has been done.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Will county; the Hon. JOSIAH McROBERTS, Judge, presiding.

This suit was brought by Nathaniel J. Pillsbury, in the Livingston county circuit court, against the Chicago and Alton Railroad Company, to recover for personal injuries alleged to have been received in consequence of the negligent or wrongful conduct of defendant. The several counts of the declaration, although somewhat different in form of expression, are, in substance, the same, and the statement of the contents of any one count will be sufficient to show upon what principal facts plaintiff bases his right of action.

It is averred in the declaration, that plaintiff became a passenger on defendant's road from Chicago to Dwight, he having purchased a ticket that entitled him to be so carried, and that it was the duty of defendant to safely carry plaintiff over its road between the points indicated, and, while being thus carried, to exercise the utmost skill, care and vigilance to protect him from all danger, risk and hazard of any personal injury, from whatever source arising, and to do no careless or wrongful act that would cause, invite or induce any danger, risk or hazard to the plaintiff, and omit no act which, in the exercise of such skill, care and vigilance, could be done by defendant to prevent the arising or existence of such danger, risk or hazard to plaintiff, or to protect him from the consequences thereof. The breach of the duty it is alleged defendant owed to plaintiff, is then averred, in general terms, to be, that while plaintiff was its passenger, and in its care and custody, as a common carrier, defendant failed and neglected to exercise such care, skill and vigilance as it is averred it was its duty to do, towards plaintiff, but, on the contrary, so negligently, carelessly and improperly and wrongfully conducted itself in that behalf that plaintiff became exposed to great danger, and was, in consequence of such negligent conduct on the part of defendant, injured, as afterwards stated. It is then averred, by way of narrative, there existed a controversy and disagreement between the Joliet Iron and Steel Company and certain persons that had previously been employed by the company at

its ore dock in the city of Chicago, situated on or near the track of defendant's road, and that, in consequence of such controversy and disagreement, the men had refused to work longer for the company at its dock, and had determined that no other persons should be employed by the company to do the work they had previously been engaged to do. The company refused to submit to the demands made by its former employes, but hired other hands to do the work. It is then further averred, the former employes confederated together to prevent by force all attempt on the part of the company to have the labor they had been accustomed to do, performed by other persons, and to continue such force until the company should receive them again into its employment. It is also averred, the iron and steel company employed men at Joliet to do the labor they wished to have done at their dock in Chicago; that defendant undertook to carry these new laborers on its railroad, from Joliet to their place of labor in Chicago, in the morning of each day, and to return them in the evening of the same, and that defendant selected and used one of its passenger trains for that service; that defendant, in pursuance of its undertaking to do so, for a long time,—to-wit, for two weeks,—selected one of its passenger cars to carry such laborers to the place of their labor in the morning, and the Dwight accommodation stopping at the same place on its return, in the evening, from Chicago, to receive such laborers and carry them to their respective destinations; and it is also averred, that during all that time it became necessary, for the protection of such laborers from the threatened assaults and frequent attempts to attack them by the confederated strikers, with clubs, stones and other missiles, and from firing upon them, and wounding and killing them, with guns and pistols, to have a large number of policemen,—to-wit, fifty well-armed men,—to surround, guard and protect such laborers while at work; and that when such laborers were leaving defendant's cars to go to the place of labor, and on returning to the cars in the evening to be

carried to their places of destination, the conduct of the riotous strikers there congregated around and about the cars was of such a fierce, revengeful, vicious, desperate and violent character, manifesting a fixed determination to lay hold of and kill the laborers, that policemen were compelled to, and did, place themselves between the strikers and the laborers, and thus protect the laborers from the violence of their threatening assailants. It is also averred, that it could be readily foreseen that in thus taking on board the train the laborers, at the time and place and under the circumstances, defendant was offering a motive and inducement to the rioters to attack the train, and that defendant was subjecting its train to the risk and danger of an attack and capture by the rioters, in their efforts to accomplish their purpose to do harm to the laborers being carried, and its passengers to the danger and risk of personal injury at the hands of the rioters. It is also averred, defendant, in disregard of its duty, stopped its train at the point where the laborers were employed, and carelessly and negligently and wrongfully received them on the train where plaintiff was being carried as a passenger, and that the riotous strikers, well knowing the laborers would be taken and received by defendant on its train, went down the track a short distance,—to-wit, one and one-half miles,—and that when defendant's train came to that point, a number of the rioters, with force and violence, broke and entered the car where plaintiff was seated, and beat, wounded and bruised the laborers, and shot off guns and pistols, loaded with powder and bullets, at and within the car, and that one of the bullets so fired out of a pistol by one of the rioters, hit and struck plaintiff, grievously wounding and injuring him. It is also averred, defendant took no steps to prevent the attack upon the train, nor to prevent the rioters from taking possession of it, and that the servants of the defendant in charge of the train made no efforts in that direction, neither did they make any effort to expel, or put out of the cars, any of the riotous in-

truders, nor did the conductor of the train, in any manner, exercise, or attempt to put in force, the police power and authority vested in him by the statute of the State. To the declaration averring these and other facts more fully than here stated, the defendant pleaded not guilty.

Most of the facts averred in the declaration out of which the controversy arises, are either admitted or are so fully proven that no controversy exists as to them. In the year 1882, and perhaps prior to that time, the Joliet Iron and Steel Company, for the convenience of transacting its business, maintained ore docks on a branch of the Chicago river, in that part of the city commonly called "Bridgeport." These docks are situated near the track of defendant's road, and are inclosed with a high, tight, board fence, with an entrance at the south-east corner, adjoining defendant's track, through a gate. The men that had been employed about the business of the iron and steel company in handling ore, formed themselves into a union or association, called "Ore Shovelers' Union." In the fall of 1881 work at these docks ceased, and the laborers were discharged for the season. When work was ready to be resumed in the spring, the men composing the union were unwilling to do the labor they had formerly done at the prices the company had fixed for the current season, and refused to go to work, and organized what is called a "strike." Being unable to agree with the strikers, the iron and steel company employed other laborers to do the work that had previously been done by the union men. The first new laborers secured were, perhaps, employed from the city, and taken out to the docks on a tugboat, and carried back in the evening. The union men endeavored, by threats and actual violence, to compel these men to quit work for the iron company, and finally, to accomplish their purpose, they threw stones at them, and at the boat carrying them to and from the ore docks. It became so dangerous that this mode of carrying the men to the docks and back again was abandoned, and thereafter, for a time, they

were carried to and from the docks in a box-car on defendant's road. The car was stopped opposite the gate leading to the docks, and the laborers were there put off the car, under the protection of the police. They were returned to the city in the evening in the same way, and under the same protection. The strikers continued to grow more violent in their opposition to these new laborers, and more determined to compel them, at all hazards, to cease to labor for the company. On one occasion, certainly, and perhaps on others, the car containing them was stoned by the strikers, and at another time the laborers were stoned and otherwise maltreated, after they had been discharged from the car on defendant's road, and after they had passed from the railroad property and were going towards Canal street. Finally, the bringing of the laborers out of the city in this way was also abandoned, and hands were sent up by the iron and steel company from Joliet to do the work. Usually the men were sent up in the morning on one of defendant's regular trains and let off at the dock gate, although that was not a regular station on defendant's road. It was done under the direction of defendant, to secure the safety of the laborers from the violence of the strikers, who would assemble at the gate on the arrival of the train and make violent demonstrations against them. It was the custom in the evening to take these laborers back to Joliet on the Dwight accommodation,— a regular train for carrying passengers on defendant's road. It is proven that when the train stopped at the dock gate to take on these non-union laborers, there was usually a large number of the union men or strikers gathered about, hooting and jeering at the laborers as they were being taken on the train. Policemen, in attendance, formed two lines from the gate to the car, through which the laborers passed,—otherwise they could not have been taken on board the train at all. It was not practicable to take these laborers on at the regular station, which was a short distance from the dock gate, on account of the violence of the union

men towards them. It was only by the aid of the police force they could be taken on at the gate. The carrying of these passengers from Joliet in this way continued for probably about two weeks, and then ceased for a time. It was resumed on the first day of June, 1882. On that morning a squad of men were brought up from Joliet to work at the dock, and were let off at the gate, as had been done before. In the evening of the same day the conductor of the Dwight accommodation passenger train had orders to stop at the dock gate and take on the laborers that had been brought up in the morning. He did so. On arriving at the gate there was a great crowd of the rioters assembled, consisting of the dissatisfied strikers. Their conduct was very violent and threatening. Amidst the howling and hooting of the mob, the police guarded the laborers in their passage from the gate to the car, and in that way they reached the car in safety. Stones were thrown by the mob at the car containing these laborers, as well as many regular passengers, of whom plaintiff was one. One stone thrown struck the door of the car and broke the glass. Perhaps some other slight damage was done. The train then moved on in safety, and without further annoyance from the rioters, until it reached the railroad crossing at Brighton Park,—a distance of a little less than one and one-half miles,—where it came to a stop, as the law requires shall be done before crossing the track of another railroad. Before the arrival of the train at that point, a number of the strikers had secreted themselves near the place where they knew the train containing the laborers would stop. Their presence there at that time was unknown to any of the servants or officers of defendant. As the train "slowed" up, these strikers left their hiding places and rushed upon the car containing these laborers, and began to assail them with all sorts of deadly missiles. The assault was furious and dangerous. It was a wild, fierce, revengeful and desperate mob. During the time of the assault, deadly missiles were thrown in and about the car, and guns and

pistols, loaded with powder and leaden balls, were discharged, with intent to kill or injure the laborers. It does not seem there was any intention on the part of the rioters to injure any of the passengers in the car with the laborers, or elsewhere on the train, but a ball discharged from a pistol by some one among the rioters, struck plaintiff, and inflicted upon him a most severe and dangerous wound.

Concerning these facts there is no disagreement between the parties. Prior to the time plaintiff was injured, there is evidence tending to show defendant's officers having charge of the moving of trains, might have known, by the exercise of reasonable diligence, that the strike was in existence at the dock of the iron and steel company,—that the strikers were determined to prevent the company from employing other laborers to do the work they had previously been hired to do. It was known to many of them the strikers were numerous and utterly lawless. There is evidence also tending to show it must have been known to them the rioters had stoned the tugboat that had been used to carry the new laborers from the city to the dock, and back again, and that it became so dangerous the officers ceased to carry them longer. It was after that, that defendant was employed to carry the laborers over its road in a box-car from the city to the docks, and back again. The rioters stoned the car, and followed the laborers at one time a distance of nearly two miles from the dock into the city, and assaulted them most violently in Canal street. Finally, this mode of carrying laborers to and from the dock became so dangerous it was abandoned, and then the expedient of bringing up laborers from Joliet on the passenger trains of defendant was adopted. There is some evidence tending to show the danger attending the service must have been fully known to defendant's servants before the conductor was ordered to stop his train at the gate on the evening plaintiff was shot, to take on board the laborers so offensive to the strikers. It does not appear the strikers had any cause of complaint against

the defendant company, or any of its officers or employes. It is also true defendant's servants having charge of the running of trains, had no actual knowledge or information the strikers contemplated a strike upon their train at the time and place where it was assailed.

The venue was changed to the county of Will, and upon the issues made, a trial was had, which resulted in a verdict for plaintiff, upon which the court rendered judgment. That judgment was affirmed in the Appellate Court for the Second District, and defendant brings the case to this court on its further appeal.

Mr. C. Beckwith, Mr. George S. House, and Mr. A. S. Trude, for the appellant:

The first of appellee's instructions required too great a degree of care on the part of the carrier. It states that it was the duty of appellant to use the utmost care, skill and vigilance to carry the plaintiff safely, and to protect him against any and all danger and injury. The rule requires the highest degree of practical care and diligence, and not the utmost. *Fuller* v. *Talbott,* 23 Ill. 357; *Packet Co.* v. *True,* 88 id. 609; *Railroad Co.* v. *Flexman,* 103 id. 546.

The only care the law requires of the carrier to protect the passenger from the attack of a mob, is in foreseeing and anticipating the danger, and that is reasonable and ordinary care. *Putnam* v. *Railroad Co.* 55 N. Y. 108; *Railroad Co.* v. *Hinds,* 53 Pa. St. 512.

The appellant was bound to carry the non-union laborers. *Vinton* v. *Railroad Co.* 11 Allen, 304.

It was not the duty of appellant to furnish their train with a police force sufficient to resist a mob. *Railroad Co.* v. *Hinds,* 53 Pa. St. 512.

To make the appellant liable, its servants must have had reasonable grounds to expect the attack, and failed to take the

proper measures to prevent injury to appellee. *Railroad Co. v. Burke,* 53 Miss. 200; *Britton* v. *Railroad Co.* 88 N. C. 536.

If a new force or power intervenes, sufficient, of itself, to stand as the cause of the misfortune, the other must be considered as too remote. *Insurance Co.* v. *Tweed,* 7 Wall. 52; *Fent* v. *Railroad Co.* 59 Ill. 349; *Railway Co.* v. *Muthersbaugh,* 71 id. 572; *Railroad Co.* v. *Becker,* 76 id. 25; *Railroad Co. v. Kellogg,* 94 U. S. 469; Wharton on Negligence, sec. 134; *Cuff* v. *Railroad Co.* 35 N. J. 7; *Railroad Co.* v. *Kinghren,* 74 Pa. St. 320.

Taking the men on board, of itself created no peril or danger likely to follow in the natural sequence of events.

Appellee's counsel, in his closing argument to the jury, addressed the jurors by name, and asked them questions eliciting replies, and went outside of the evidence to impress on the minds of the jury the great power of railroad corporations, and induce them to believe that appellant was not above bribing of witnesses. This was error. *Earll* v. *People,* 99 Ill. 124; *Ferguson* v. *State,* 49 Ind. 33.

Messrs. Garnsey & Knox, and Mr. C. C. Strawn, for the appellee:

A carrier of passengers is bound to the utmost care and diligence, and is responsible for any, even the slightest, neglect. *Taylor* v. *Railway Co.* 48 N. H. 304; *Stokes* v. *Saltonstall,* 13 Pet. 81; *Railroad Co.* v. *Derby,* 14 How. 486; *Pennsylvania Co.* v. *Roy,* 102 U. S. 451; *Hegeman* v. *Railroad Co.* 16 Barb. 353; 3 Kern. 9; *Caldwell* v. *Murphy,* 1 Duer, 241; *McElroy* v. *Railroad Co.* 4 Cush. 400; *Railroad Co.* v. *Aspell,* 23 Pa. St. 149; *Railroad Co.* v. *Kennard,* 21 id. 203; *Railroad Co.* v. *Yarwood,* 15 Ill. 468; Redfield on Railways, sec. 149, note.

The carrier can not excuse himself on the ground that he could not foresee the injury would certainly occur. *Railroad Co.* v. *Pennell,* 110 Ill. 435.

As to the right and duty of the conductor to remove a passenger from the train, see *Vinton* v. *Railroad Co.* 11 Allen, 304; *Pearson* v. *Duane*, 4 Wall. 605; *Thurston* v. *Railroad Co.* 4 Dillon, 231.

As to the right to refuse to take passengers, see *Jencks* v. *Coleman*, 2 Sumner, 221.

Messrs. BULL, STRAWN & RUGER, also for the appellee:

What is a proximate cause is a question of fact, which this court can not try. *Railway Co.* v. *Kellogg*, 94 U. S. 74; *Nagel* v. *Railway Co.* 75 Mo. 661; *Lane* v. *Atlantic Works*, 111 Mass. 136; *Binford* v. *Johnston*, 82 Ind. 428; *Billman* v. *Railway Co.* 76 id. 166; Cooley on Torts, 70; Addison on Torts, sec. 12; *Hill* v. *Windsor*, 118 Mass. 258.

The fact that appellant had notice, or good and sufficient reasons to apprehend, that in stopping the train in the midst of an infuriated mob and taking on the non-union men was a dangerous act, is alleged, and found as a question of fact in favor of appellee, and this is conclusive on this court. *Railway Co.* v. *Elliott*, 98 Ill. 481; *Railroad Co.* v. *May*, id. 108, 288; *Railroad Co.* v. *Rung*, 104 id. 641; *Ives* v. *McHard*, 103 id. 97; *Fitzsimmons* v. *Cassell*, 104 id. 35.

If there be any competent evidence tending to prove the fact, this court is likewise bound by the finding of the lower courts, and will not inquire into its weight or sufficiency. *Bank of Montreal* v. *Page*, 98 Ill. 109; *Moore* v. *Stanwood*, 98 id. 605; *Albin* v. *Kinney*, 96 id. 214.

Whether a party was negligent, is a question of fact within this rule. *Haywood* v. *Merrill*, 94 Ill. 349; *Railway Co.* v. *Rector*, 104 id. 290.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

Under the facts as they must have been found, from the evidence, by the trial and Appellate courts, it is a question of law what duty defendant owed to plaintiff and other passengers

on the train at the time the injury was inflicted upon plaintiff, and whether any liability rested upon defendant. Upon these questions the trial court instructed the jury, it was the duty of defendant, as a common carrier of passengers, "to exercise the utmost care, skill and vigilance to carry plaintiff safely, and to protect him against any and all danger, from whatever source arising, so far as the same could, by the exercise of such a degree of care and vigilance, have been reasonably foreseen and prevented." It is said this instruction does not announce the law with entire accuracy,—that it required a higher degree of care to be observed by defendant for the safe carrying of a passenger than the law imposes,—and in that respect was misleading.

It is freely conceded there is a marked distinction between the liability of a common carrier as to freights and passengers. As to freights, the carrier is an insurer, and is obligated to carry and deliver safely, at whatever hazard, and from that obligation it can only be relieved by "the act of God" or the public enemy. But the carrier is not an insurer of the absolute safety of the passenger to be carried. Its liability in that respect is limited by care and diligence. What degree of care the common carrier must observe for the safety of a passenger on its train, to exonerate it from liability for injury, is a question of law. The rule of law is quite well understood, that as to the selection of suitable machinery and cars, the fitness of the road, both as to manner of construction and materials used, and in the use of all appliances adopted for the government or moving of trains, and as to the selection and retention of competent and faithful servants, the carrier of passengers is obligated to use the highest reasonable and practicable skill, care and diligence. This principle of law is not called in question, but the argument is made, that in guarding passengers from dangers and perils not incident to ordinary railway travel, the carrier is only to be held to the use of ordinary and reasonable care and diligence. The distinction taken is not

without support, both in reason and authority.   So far as the machinery and cars furnished for the carriage of passengers, the fitness of the road-bed, and the competency and faithfulness of the servants employed, and in the use of the best known mechanical appliances to insure safety, are concerned, the passenger must rely solely on the carrier, and can do nothing to insure his personal safety.   It is for that reason the carrier, in this respect, is obligated to the highest reasonable and practicable skill and diligence.   The safety of passengers requires the strict and rigid observance of this rule against all carriers, by rail or otherwise ; but as to dangers and perils not incident to ordinary perils by any mode of travel, the rule of liability imposed upon the carrier of passengers by law is less stringent. The carrier, however, must omit no care to discover and prevent danger to a passenger or passengers that is reasonable and practicable.   The public exigency and security demand this much of the carrier at all times and under all circumstances.   It is the duty of carriers by rail to preserve order in their carriages, and to protect passengers from all dangers, from whatever source, arising on their trains, whether from the dangerous and violent conduct of other passengers or otherwise.   To this end all conductors in this State, while on duty on their respective trains, are invested by statute with police power.   With regard to danger and hazard to travel arising otherwise than on the train, and not incidents of such travel, the degree of care to be observed to discover and prevent all danger to and consequent injuries to passengers, must depend in a large measure on the attendant circumstances.   No doubt in many cases, if the carrier observes ordinary care and diligence to discover and prevent injury to passengers, such as any prudent person would do for his own personal safety, it will be exonerated from liability.   In other cases and under other circumstances it will, no doubt, be the duty of the carrier to exercise the utmost care, skill and diligence to protect the passengers from danger and injury, so far as the same, by the

exercise of such care and skill and diligence, could have been reasonably and practicably foreseen and anticipated in time to prevent injury. In no case must the carrier expose the passenger to extra-hazardous dangers, that might readily be discovered or anticipated by all reasonable, practicable care and diligence. It is upon this latter principle, if at all, that defendant can be held liable for the personal injuries received by plaintiff.

So far as any question of fact is involved, it will be presumed it was found against defendant by the trial court. There is some evidence that would warrant the jury in finding defendant's servants were fully advised it was a dangerous service to take off and put on the non-union workmen at the dock gate. It must have been found they knew a desperate and wicked mob, consisting of great numbers, was organized there, to prevent, at all hazard, whatever the consequences might be, the taking on of these men, and that it could only be done by the aid of a powerful and efficient police force. Prior to the time the plaintiff was injured, the box cars containing these laborers had been assailed, and it might reasonably have been inferred the danger to passenger cars on the same account was imminent, and common prudence should have induced the taking of extraordinary precautionary measures. It could have been readily ascertained, upon the slightest inquiry, the fury of the mob had in no degree abated. Reasonably it might have been inferred it would be dangerous to continue to take on and put off the laborers in the midst of that lawless assembly of rioters. Even ordinary care would have discerned the danger. Under the circumstances, the law would charge defendant with negligence in stopping a train filled with passengers, in the midst of a howling, revengeful, lawless mob, to take on persons whom the mob were seeking an opportunity to maltreat. The defendant was under no legal obligation to stop its train at the point in question, as it was not a station designated for that purpose. To do so was a

needless and unwarrantable exposure of the lives and persons of passengers to imminent peril. This train, filled as it was with men, women and children, as it may be presumed it was, stopped at a point not a station, in the midst of a fierce mob, and the objects of its vengeance taken into the same car with passengers. This was unwise and hazardous in the extreme, to say the least of it. At all events, the offensive persons should have been placed in a car to themselves, where they could have been protected, or could have protected themselves, without danger to regular passengers who had not previously been advised as to the danger to be encountered. Some of the passengers, it seems, were advised by the conductor it would be dangerous to remain in the smoking car, where the laborers were to be received, but plaintiff was not so advised.

It is said none of the officers had any knowledge the rioters intended to or had any purpose to attack defendant's passenger train at Brighton Park, or elsewhere, at that or at any other time. That is no doubt true. Had the officers of the road been informed the rioters purposed an attack on the passenger train of defendant, at Brighton Park or elsewhere, it would have been criminal negligence to have exposed the passengers to such peril, without a sufficient police protection, and which would have been inexcusable for any reason or upon any ground. No such negligence can be imputed to defendant under the facts of this case. But defendant ought reasonably to have anticipated the mob might attack its train to reach the object of their vengeance, so soon as it had passed from the protection of the police, and precautionary measures should have been taken. Such a thing was likely to occur at any near distance from the central point of the disturbance. A like attack had been made prior to that time, two miles distant, upon the laborers that had been carried in the box car. On this occasion the mob seems to have been more violent than usual, and the utmost care and vigilance should have been taken to prevent the injury to passengers. The verdict is a

sufficient warrant for the conclusion, reasonable precautions were not observed.

Some criticism is made on the instruction given, in the use of the word "such," and in the use of the words "care, skill and diligence," but the distinction taken in this respect is too subtle to be warranted by any fair reading of the instruction. After a most careful consideration it is thought the first instruction given for the plaintiff, of which complaint is made, states the law applicable to the facts of this case with sufficient accuracy, and there is no just ground for complaint on that score. It might be that in another case, where the facts are materially different, the instruction would not be applicable, and might be held to impose a degree of care and skill not enjoined by the law.

What is said of the first instruction is sufficient to dispose of the objections to the other instructions, and they need not be further discussed. It may be conceded the fifth instruction of the series given for plaintiff, is in some respects slightly inaccurate, but not seriously so. The injury suffered by plaintiff is so serious in its consequences, the judgment in his favor ought not to be reversed for any mere subtle objection to an instruction, not warranted by the substantial justice of the case.

Objections are also taken to the refusal of the court to give a number of instructions asked by defendant, and to the modification of others by the court. It is seen the instructions for defendant are quite numerous, and state the law very favorably to the defence sought to be made. It may be conceded, as is done, that some of the instructions refused might have been, with propriety, given, had not others been given containing substantially the same proposition. The court was under no duty to repeat the same thing, although expressed in different language and differently formulated. It would have aided, in no proper way, the defence defendant was endeavoring to make.

It is assigned for error the court permitted counsel, in his closing argument, to make statements of facts not in evidence,

to the prejudice of defendant, and to address the jurors by name, and to propound questions to them, and receive answers to such questions, against the objection of defendant. It may be, counsel indulged in intemperate language not justified by anything in the case; but the manner of conducting the oral argument before the jury is so much within the discretion of the trial court that this court will hesitate to interfere, unless it should appear manifest injustice was done. It is the duty of the trial court to require counsel to keep always within the bounds of propriety, and to be mindful of the rights of others who are not permitted in that presence to make reply.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. Justice Magruder, dissenting:

I do not concur in this decision, seeing no reason for retreating from the views expressed in the opinion adopted by a majority of the court on the original hearing, but which has subsequently been rejected upon the rehearing. The opinion, so rejected, with the exception of a few unimportant changes, is as follows:

The question, presented by this record, is, whether a railroad company can be held liable for injuries, inflicted upon a passenger by a mob, which boards the train at a legal stopping place, and, overpowering the officers in control, makes an attack upon certain of the passengers, who have incurred its ill-will.

The facts so far as it is necessary to recite them, in order to understand the principles of law announced in the instructions are as follows:

In the spring of 1882 the Joliet Steel Company, whose main works were located at Joliet, owned certain docks in the city of Chicago located on the South branch of the Chicago river, about three miles from appellant's main depot and in a portion of the city called Bridgeport. Except on the river side the docks were surrounded by a high wooden fence with a

gateway therein for passage into and out of the dock-yards. The tracks of appellant's road passed within about thirty feet of this gateway. It was usual for vessels, loaded with ore, to land at these docks, and discharge their cargoes, which were shipped thence, in cars, over appellant's road, to the mills of the steel company at Joliet. A large number of men were employed in unloading the ore from the vessels and reloading it upon the cars. The men, so engaged, had some difficulty with the steel company, in April or May, 1882, upon the subject of their wages, and inaugurated a "strike," which lasted more than six weeks. They not only refused to work themselves, but attempted to prevent others from working in their places. The company employed other laborers, as substitutes for those, who had left its service, and brought them from the center of the city to its dock-yards, in tug boats, upon the river, and, in cars, upon the railroad tracks. It also hired laborers in Joliet, which was about thirty miles distant from the yards. The Joliet laborers would come up to Chicago, early in the morning, upon an accommodation train on appellant's road, work at the docks during the day, and in the evening return, in an accommodation train, over appellant's road, to their homes in Joliet. The "striking" laborers belonged to an organization known as the "Ore Shovelers' Union," and called themselves, "union men." The new laborers, engaged to take the places of the "strikers," were not connected with the organization in question, and were called, "non-union" men, or "scabs."

During the existence of this strike, work was done at the docks under the protection of policemen. The "striking" workmen, some three hundred or four hundred in number, would gather in the neighborhood every day, and seek, by jeers and hooting, and by the throwing of stones and other missiles, to intimidate the new laborers, and drive them from their work. Only the presence of the police force, embracing sometimes as many as sixty men, prevented riot and bloodshed and the de-

struction of property. It is to be noted, however, that there was, at no time, any difficulty between the "strikers" and appellant. The hostility of the rioters was directed solely against the steel company, and their new employes.

At Chicago, on the afternoon of June 1, 1882, appellee took passage over appellant's road, upon the Dwight accommodation train, seating himself in the smoking car. This train left the main depot of appellant, in the city of Chicago, at five o'clock in the afternoon, and passed through Joliet, on its way to Dwight. Upon arriving at the docks, it stopped to take on thirteen non-union laborers, who had come up from Joliet in the morning, and had been at work, during the day, for the steel company, under the protection of the police. The laborers in question took their seats in the smoking car, where appellee was sitting. They walked from the gateway to the car between two lines of policemen, who were stationed there to keep back the rioters. Much noise and confusion prevailed, and the mob was loud in its demonstrations of anger towards the non-union men. No actual violence, however, was committed, except that a stone, thrown by one of the crowd, struck the forward door of the smoking car, with such force as to break the glass.

The train proceeded, without interruption, for a distance of about two miles, until it neared a railroad crossing just north of Brighton Park station, where it stopped, as required by law. At this point over one hundred of the strikers, who had concealed themselves in a grove of trees near the park, and behind shrubs and fences, and in the ditches, suddenly sprang from their hiding places, and made an attack upon the train, which consisted of an engine, a baggage car, a smoking car and two passenger coaches. Pistols were placed at the heads of the engineer and fireman, who were threatened with death, if they moved the train, until ordered to do so. The conductor was knocked from the back platform of the smoking car to the ground, and finding, when he regained his feet, that the platforms were crowded with the rioters, he ran to

the station to telegraph for the policemen at the docks. The brakeman went into the forward passenger coach and locked the forward door, and put down the windows, to protect the women and children from the strikers and their weapons. It does not appear, however, that the rioters used any more violence towards the officers of the train than was necessary to enable them to get control of it. They entered the smoking car, and commenced a furious onslaught upon the thirteen non-union laborers, beating them with clubs, chunks of ore, stones and railroad coupling pins. During the melee and confusion, a pistol was discharged, the ball of which struck appellee in the left groin, while he was standing in his seat. The injury to him, in consequence of the wound, so received, has been very great. The ball has never been extracted from his body. His power to labor has been impaired. He is unable to write, except in a reclining position. At times he suffers intense pain. Unquestionably, his health has been seriously, if not permanently, shattered. Upon the trial in the circuit court of Will county, the jury found a verdict, in his favor, for $12,500, and the court rendered judgment upon the verdict. The Appellate Court for the Second District has affirmed the judgment, and the case is brought before us, by appeal from that court. Is the appellant liable?

In order to justify a recovery, it must be shown, that appellant was guilty of negligence, and that such negligence was the proximate cause of the injury to appellee.

The instructions proceed upon the theory, that the taking of the non-union men upon the train, on the evening of June 1, 1882, was an act of negligence. The jury were told, in substance, that, if the circumstances were such, as to lead a prudent man to believe, that the presence of the non-union men upon the train would provoke an attack by the strikers, and the appellant knew of such circumstances, then the admission of the non-union men into the cars was a violation of appel-

lant's duty to its passengers, and the appellee was entitled to a recovery.

"The law requires common carriers of passengers to take and carry every one, who desires to go, provided they have room, and there be no objection on account of the condition, habits, character, deportment, or purposes of the passenger." *Galena and Chicago Union Railroad Co.* v. *Yarwood,* 15 Ill. 468.

"The company has no power to adopt rules and regulations, prohibiting decently behaved persons, who will pay their fare and conform to all reasonable regulations for the safety and comfort of passengers, from traveling on the road." *Chicago, Burlington and Quincy Railroad Co.* v. *Bryan,* 90 Ill. 126.

It is the duty of a railroad company "to receive and carry all persons, as passengers, wishing to become such, provided they, in good faith, offer to pay the usual fare." Rorer on Railroads, page 961; Angell on Carriers, secs. 524, 525; Story on Bailments, 591.

It is true, that the rule, here laid down, is subject to certain qualifications. There are those, whom the common carrier is not bound to receive or carry. "He is not obliged to carry one, whose ostensible purpose is to injure the carrier's business, one fleeing from justice, one going upon a train to assault a passenger, commit larceny or robbery, or for interfering with the proper regulations of the company, or for gambling, or committing any crime; nor is he bound to carry a person, who, on account of his drunken condition, would be obnoxious to passengers, nor one affected with a contagious disease." (Thompson's Carriers of Passengers, page 29.) Persons may be rejected, "who are of known and notoriously bad or even justly suspicious character, or persons offensively gross and immoral in their conduct, habits or behavior, * * * or such as refuse to pay their fare, or to conform to the reasonable rules and regulations of the company." Rorer on Railroads, page 958.

The above extracts, based as they are upon numerous adjudicated cases, indicate the nature and character of the objections, which common carriers are justified in making to persons, who demand to be carried as passengers. No such objections existed in the case of the thirteen "non-union" laborers, received on its train by appellant.

It is said, that these laborers had incurred the wrath of an angry mob, and that their presence on the train invited the vengeance of that mob. They had, however, done nothing to deserve the hostile treatment, exhibited towards them. They had agreed to work for the steel company upon being paid certain wages, and were endeavoring to perform their agreement. What they were doing was clearly permissible under the law. Where the employer and the employee make a contract with each other, and arrange the terms, satisfactory to themselves, upon which the one shall receive and the other shall render service, they are acting strictly within the limits of their constitutional rights. In this country, any man has a right to work for whom he pleases upon any conditions, that he chooses to submit to, provided the occupation, engaged in, is lawful in its character. Any individual or any organization, which assumes to interfere with the exercise of such right, infringes upon the personal liberty and freedom of action, which it is the object of our institutions to secure to every law-abiding citizen.

In the light of these principles, the non-union workmen were committing no offence. They were earning their living, in an honest way, by legitimate labor in a lawful occupation. To hold that, because they were so doing, a common carrier was authorized to refuse to give them passage over its road, would be to maintain a monstrous doctrine, indeed. It is true, that the "Ore Shovelers' Union," a labor organization, outside of and unknown to the law, chose to take offence at their conduct, and to pursue them with unnatural violence. But we are not prepared to hold, that a common carrier will be justified in

refusing to receive a person, as a passenger in its conveyance, simply because that person's exercise of his lawful rights has become offensive to his unreasoning neighbors, and provokes from such neighbors unreasonable demonstrations of hostility against his person. Suppose that the appellee, who is a judge of one of the Appellate Courts of this State, had, by his declaration of the law upon some public question, stirred up such a feeling of hostility towards himself among a certain class of persons along the line of the railroad, over which he was obliged to travel from his home to the place, where his court held its sessions, that he was in danger from mob violence, and that, upon his application to be received as a passenger, the railroad company had declined to admit him, upon its train, on the ground, that his presence there might provoke an attack, at some point on the road, and, so, cause injury to the passengers. Would the company be justified in thus preventing him from going to the performance of his official duties? We see no difference between the case supposed, and the case, presented by the record. The law is no respecter of persons. Its glory is, that it extends its protecting hand, as well to the lowly workman, as to the learned judge. Each one of these thirteen "non-union" laborers, soiled with ore dust from the docks, yet willing to comply with the reasonable regulation, which required him to take his seat in the smoking car rather than in either of the passenger coaches, was as much entitled, as was appellee, to demand of a carrier, holding its franchises, at the hands of the State for the benefit of the whole public, a safe passage, at the close of his day's labor, to his home and his family.

Hence, it was no less the duty of the railroad company to take the thirteen laborers on the train, than to take the appellee thereon. Appellant was not obliged to neglect its duty to the one, because the performance of that duty might, in some remote and uncertain degree, result in harm to the other. It is not contended, nor is there a particle of evidence to show,

that the appellant had any notice, that this attack would be made on its train, either at the place, where it was made, or at any other point on its road. Laborers had been brought up from Joliet to Chicago in the morning, and returned to Joliet in the evening, prior to June 1, 1882, but the "strikers" had made no attack, before this particular day, upon any passenger train. They laid their plans with rare cunning and secrecy. Instructions must be based upon the evidence. If it is left to the jury to determine, whether or not a prudent man would draw certain conclusions from certain circumstances, it must at least appear, that there was some reasonable and natural relation between the circumstances existing, and the conclusions to be drawn from them. No prudent man, even in the exercise of that high degree of care, which the law imposes upon the carrier of passengers, could be expected to foresee or anticipate, that the animosity of union towards non-union laborers would lead to such a wanton and fiendish attack, as is shown by this record to have been made, in a civilized city and under a government of law, upon a train full of peaceable and orderly passengers.

The third instruction, given for the appellee, told the jury, that the appellant could not justify the admission of the non-union laborers into the train, "on the ground that the defendant had issued to the foreman of said laborers a ticket, on which they were carried on said train." We think, that this instruction was calculated, under the circumstances of this case, to make a wrong impression upon the minds of the jury. It seems to intimate, that the obligations of appellant to the laborers would be less binding, in a case where their common employer paid for the passage of all of them and purchased one ticket for them all, than such obligations would be in a case, where each laborer paid his own fare and bought his own ticket. We know of no authority and can see no reason for any such distinction. Whatever rights and privileges would inure to the benefit of the laborers by reason of their fare being paid, would

3—123 ILL.

so inure, whether such fare was paid by themselves, or by the steel company, which employed them.

It is further claimed, that there was no regular passenger station at the ore docks, and that, for this reason, appellant was not obliged to stop there and take on the thirteen workmen.  Even if it was not *obliged* to stop, it will not be denied, that it had the *right* to stop.  And it is a matter of serious doubt whether the industries of a great commercial center, or the carriers and other agencies, which minister to and aid in their operation, are bound to suspend the exercise of their legal rights, or cease the transaction of their lawful business, simply because there exists some disturbance in the community, which the officers of the law, either through unwillingness or inefficiency, fail, for the time being, to successfully quell.

But, independently of this consideration, the undisputed proof shows, that the gateway of the dock-yards was just south of the river, while right across the bridge, on the north side of the river, was the regular Bridgeport station; that, some weeks before June 1, 1882, the steel company had made an arrangement with appellant, by which the latter agreed to let off and take on the laborers at the docks, rather than at the station, because the men would be in danger of being injured by the mob, if compelled to walk from the one place to the other across the bridge; that the taking on of the thirteen workmen on June 1, 1882, was merely *one act* in the performance of a previous contract between the appellant and the steel company, by the terms of which appellant was to bring men *from* Joliet and return them *to* Joliet, on each and every day, when their services were needed at the docks.  The 85th section of the Railroad act, provides, that railroad companies shall receive and deliver passengers "at their regular or appointed time and place."  The 88th section provides, that trains shall stop a certain length of time "at each station, advertised * * * as a place for receiving and discharging passengers." (Hurd's Rev. Stat. of 1885, pages 944, 945.)  These sections

are merely declaratory of a general rule of the common law, that, where a common carrier *advertises*, that it will stop at certain regular and appointed stations, such advertisement constitutes a special *contract* between it and the public, that it will so stop. (Angell on Carriers, sec. 527 a.) Hence, the obligation to stop at a regular passenger station rests upon the basis of *contract.* In the case at bar, the duty of appellant to stop at the docks did not grow out of a contract, to be *implied* from its appointment and advertisement of the docks, as a regular station, but it did grow out of an equally binding contract, actually entered into before that time, as above stated, between appellant and the steel company.

It is to be observed, also, that this contract was made, for the benefit as well of the "non-union" laborers, as of the steel company. When appellant brought the men from Joliet on the morning of June 1, it landed them at the docks with the distinct understanding, that the train was to stop for them in the evening and take them home. To have refused to receive them on board in the evening would have been to leave them to the tender mercies of the mob during the night. This would have been not only a violation of the contract, but an unmitigated cruelty.

The instructions, given to the jury, on behalf of the appellee, by the trial court, kept entirely out of view the obligations, which were imposed upon appellant, by reason of the previous arrangement, for the carriage of the workmen, so made between it and the steel company. They also ignored and kept out of view the obligations, which appellant was under to take the laborers away from the docks at the close of the day, by reason of having carried them to the docks at the beginning of the day. These instructions simply presented to the jury the naked question, whether it was right or not for appellant to stop at the docks, and take on the laborers, on that particular evening, without reference to the binding force of the existing contract on the subject, and without reference to the binding force of

appellant's previous conduct towards the laborers themselves. They were, therefore, erroneous.

It is, however, contended, that, if appellant was bound to take the "non-union" men on board, it should have provided a sufficient force to protect them against the dangers, which were likely to arise under the circumstances. It is true, that the 105th section of the Railroad law of this State provides, that conductors of railroad trains "shall be invested with police powers, while on duty on their respective trains." (Hurd's Rev. Stat. of 1885, page 948.) But the object of this provision was merely to clothe such conductors with the authority to keep order among their passengers. This abundantly appears from the language of the 106th and 107th sections, which authorize conductors to remove disorderly passengers, and to call on the other employes of the train and the other passengers to aid them in such removal, and which also authorize a conductor to arrest any person, committing a crime on the train. It was never the intention of the statute to require railroad companies to carry a force, large enough to repel the attack of an outside mob.

In this case, the testimony tends to show, that the strikers, who made the attack, consisted of between one hundred and two hundred men. The officers in control of the train were unable to do anything against such a force, and were overpowered. The duty of protecting the citizens of the State against so large a body of rioters, as is here referred to, rests upon the civil authorities, and not upon the railroad corporations. To impose such a duty upon the latter would be to clothe them with a part of the functions of the government itself.

In *Pittsburgh, Fort Wayne and Chicago Railway Co.* v. *Hinds,* 53 Pa. St. 512, the Supreme Court of Pennsylvania say: "The case is that of a mob, rushing with such violence and in such numbers upon the cars, as to overwhelm the conductor as well as the passengers. It is not the duty of railroad companies

to furnish their trains with a police force adequate to such emergencies. They are bound to furnish men enough for the ordinary demands of transportation, but they are not bound to anticipate or provide for such an unusual occurrence, as that under consideration."

The doctrine, here announced in the Pennsylvania case, was approved and indorsed by the Supreme Court of Massachusetts, speaking through Mr. Justice Gray, in *Simmons* v. *New Bedford, Vinyard and Nantucket Steamboat Co.* 97 Mass. 361.

Rorer on Railroads, at page 1105, says: "A railroad company is not liable in an action, at the suit of a passenger, for injuries received by mob violence in the course of his transportation on its cars, if without the power of the company to prevent the same. The duties of railroad companies, as carriers, do not include the obligation of providing and carrying a police force or guard, sufficient to suppress mobs, who intrude into the cars."

To the same effect is Shearman & Redfield on Negligence, sec. 278 b.

Tested by the principles, here laid down, the first instruction given for appellee, was erroneous. It directed the attention of the jury to the negligence of the defendant, "as alleged in the declaration." One count of the declaration alleges, that appellant was guilty of negligence because it "failed and neglected to provide a sufficient force * * * to protect the said train from attack by said striking workmen."

Mr. Chief Justice Sheldon: I concur in the dissenting opinion of Mr. Justice Magruder.