Andrew Letsos, Plaintiff-Appellee, v. Chicago Transit Authority, a Municipal Corporation, Defendant-Appellant.

Gen. No. 53,548.

First District, Third Division.

October 2, 1969.

Rehearing denied and supplemental opinion
January 15, 1970.

George J. Schaller, O. R. Hamlink, Jerome F. Dixon, and Michael A. Gerrard, of Chicago, for appellant.

William J. Colohan and John L. Roach, of Chicago, for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

While riding on a bus operated by the Chicago Transit Authority, Andrew Letsos was injured by another pas-

senger. His complaint charged that the defendant negligently failed to preserve order on the bus and failed to take timely action to protect him from harm by warning, restraining or ejecting passengers who were disorderly and dangerous. A jury found the issues in his favor and a judgment for $25,000 was entered on the verdict. The defendant's only contention on appeal is that the trial court erred in denying its motion for judgment notwithstanding the verdict.

Letsos and his cousin Peter Tselios completed their work in downtown Chicago on the night of April 2, 1962, and about 8:45 p. m. boarded a west Madison Street bus to go home. Letsos and Tselios were white; the driver and the rest of the passengers on the crowded bus were black. They stood until two people got up and then found seats in the front of the bus: Tselios with three other passengers on the long, side seat to the driver's right; Letsos behind him, on the aisle side of the first forward-facing, two-passenger seat.

Shortly after they boarded the bus, noise, hollering and argument came from the rear and continued throughout their journey. Passengers got on and off and the bus was less full when it approached Oakley Boulevard, a street about three miles west of the downtown area. As it neared that street a man stepped on Tselios' feet on his way to the front door. Tselios exlaimed: "You stepped on my foot." The man made some reply, hesitated at the door and then, at the driver's urging, got off. The driver closed the door quickly and drove on. As the door closed, another man who was seated behind the driver and across the aisle from Tselios told him to watch his feet. Tselios said for him to mind his own business and the man replied, "When you trip my people, I make it my business." He got up and went for Tselios; Tselios grabbed his arms and they scuffled.

Simultaneously with this altercation, the commotion in the back of the bus increased. Shots were fired. Letsos,

who had remained seated was shot twice, once in the left leg and once in the left heel.

Amidst confusion and screaming the bus pulled to its regular stop at Western Avenue. The driver ran across the street to a store and telephoned his dispatcher. The passengers scrambled out and dispersed. Letsos fell to the floor and lost consciousness. He awakened in the hospital. His tibia was fractured and a bullet was embedded in the bone's pulmonary canal.

The driver testified that he heard no disturbance until the bus reached Oakley Boulevard. At this stop he saw a passenger stumble all the way to the front door. The passenger turned around and told one of the two white men to take his feet out of the aisle; he paused like he was going to get involved physically and the driver told him he was holding up the bus. He got off but more words were said and he started to get back on. The driver slammed the door and "took off for Western"—a long block away. The driver heard the argument and saw the encounter between the black man back of him and the white man across the aisle. At this same time, while the bus was between Oakley and Western, he saw another man come from the back and strike one of the white men. He said the two black and the two white men fought in the middle of the floor. He said it was his intention to separate them and to put them off the bus but when the shots were fired everyone "evaporated."

The driver testified that he was the last one off the bus, but he also said that others left after he did, including the man who came from the back of the bus and participated in the fight. While he did not see a gun and did not know who did the shooting, in his opinion it was done by this man. After making his telephone call and returning to the bus, he saw this man leave the bus by the rear exit and enter a taxicab. Although the driver suspected that this man did the shooting and knew he had taken part in the affray, he did not mention this to

29

the police who were at the scene and did not note the license number of the cab.

Only two witnesses, other than Letsos and the bus driver, testified about the occurrence. Tselios was in Greece at the time of the trial and the two witnesses were women who said they boarded the bus one stop before Oakley Boulevard. They telephoned the defendant a day or two after the shooting to report that they had been injured while getting off the bus. They testified that they sat in the rear and that nothing unusual happened until the bus reached Western Avenue, where some hollering and shooting took place. Their testimony was of dubious quality. They did not hear either the disturbance at Oakley or the altercation after Oakley—although both were acknowledged by the driver. Determining the weight and credibility of their testimony was the jury's function.

 Letsos, as a passenger in the defendant's bus, was entitled to the highest degree of care. Blackwell v. Fernandez, 324 Ill App 597, 59 NE2d 342 (1945). A passenger who pays his fare to a common carrier expects safe transportation to his destination and a carrier is required to do all that human care, vigilance and foresight can reasonably do to transport its passengers safely, consistent with its mode of conveyance and the practical operation of its business. Lutz v. Chicago Transit Authority, 36 Ill App2d 79, 183 NE2d 579 (1962). This duty includes the obligation of using due diligence to protect its passengers from assault, injury and abuse by third persons. Chicago & Alton R. Company v. Pillsbury, 123 Ill 9, 14 NE 22 (1887); McMahon v. Chicago City Ry. Co., 143 Ill App 608 (1908); affd 239 Ill 334, 88 NE 223.

The defendant does not quarrel with these general principles but its contention is that the injury occurred so suddenly and unexpectedly that it could not have been foreseen by the driver, and consequently the trial court

should have set aside the verdict for Letsos and entered judgment in its favor.

██ A defendant's motion for judgment notwithstanding the verdict should be granted only where all the evidence when viewed most favorably to the plaintiff is so overwhelmingly in the defendant's favor that a verdict for the plaintiff could never stand. Larson v. Harris, 38 Ill2d 436, 231 NE2d 421 (1967); Bernier v. Skripek, 86 Ill App2d 118, 229 NE2d 890 (1967). The evidence created a factual issue for the jury's resolution. The evidence was sufficient to allow its verdict to stand and the trial court properly denied the defendant's motion.

From the evidence most favorable to the plaintiff the jury could have found that there were two disturbances on the bus: that there was continual argument in the rear during Letsos' trip, that this led to the shooting, that the quarreling should have alerted the driver to impending trouble and that he should have taken steps to stop it; that even if the driver was unaware of the disturbance in the back of the bus, he was not unaware of the disturbance in the front and that he had time to, and should have taken immediate action to quell it.

The driver admitted that he was apprehensive about the situation at the time the tripping took place. He testified that when this happened he "discovered that the situation was going to occur" and that he ordered one of the participants off the bus and slammed the door in his face. Immediately thereafter his apprehension was realized. He heard a belligerent voice say, "Why don't you mind your own damn business" and the hostile reply, "When you trip my people, I make it my business." He knew there were only two white men present and he saw a black man start fighting with one of them. He stated that this took place when he was halfway between Oakley and Western. He then observed another black man get into the fight. He said that this happened "some-

where between Oakley and Western" and he also said it occurred when he was "wheeling into Western." He was asked to stop the bus, but he did not. He did nothing until he arrived at the next regular stop and then he ran away to make a telephone call.

■ Occurrences such as this are not so unusual that the defendant can be said not to know about them or not foresee their taking place. They have occurred frequently enough to cause the Illinois Legislature to enact a law requiring the posting in every vehicle used for the transportation of the public a notice of the statutory punishment for assaulting a passenger. Ill Rev Stats 1967, c 100, § 31. The defendant operates buses and rapid transit trains throughout the City of Chicago and into some of its suburbs at all hours of the day and night. This puts a heavy burden upon the defendant. It does not relieve it, however, from the duty to do all that human care, vigilance and foresight can reasonably do to protect its passengers from harm. In Neering v. Illinois Cent. R. Co., 383 Ill 366, 50 NE2d 497 (1943) the court stated:

> "Knowledge of conditions which are likely to result in an assault upon a passenger, or which constitute a source of potential danger, imposes the duty of active vigilance on the part of the carrier's agents and the adoption of such steps as are warranted in the light of the existing hazards."

■ The jury's conclusion that the defendant was negligent in not safeguarding the plaintiff was supported by adequate evidence. The defendant's driver had timely notice of the potential danger to his passengers, he could have foreseen or could have reasonably anticipated that trouble would develop which would expose the passengers to injury, and he had a reasonable opportunity to prevent the dangerous conditions from culminating in such injury. Other than closing the door upon one trou-

32

blemaker, he did nothing to maintain order. He could have done more. He could have stopped the bus and attempted to calm the bellicose passengers or ordered them to leave; he could have opened the doors and permitted the peaceful ones to step out until the danger abated or further transportation arrived. The words of the white and black man were provocative, their voices hostile, the situation, with its racial overtones, explosive. Violence was imminent and ordinary care, let alone the highest degree of care, would have dictated the taking of cautionary measures to forestall injury to innocent passengers.

The trial court's denial of the defendant's motion for judgment notwithstanding the verdict is affirmed and the judgment for the plaintiff is upheld.

Affirmed.

SCHWARTZ and McNAMARA, JJ., concur.

## SUPPLEMENTAL OPINION ON PETITION FOR REHEARING

The Chicago Transit Authority's petition for rehearing finds comparatively little fault with the observations in our opinion concerning the altercation in the front of the bus but it charges that we made an "incredible" finding, unsupported by a "syllable of testimony," that there was an argument in the rear of the bus before it reached Oakley Boulevard and that this argument led to the shooting. This court made no such finding. We said that the *jury* could have found from the evidence most favorable to the plaintiff that there was continual argument in the rear of the bus during Letsos' trip and that this led to the shooting.

The record shows: Letsos testified that an argument started in the back of the bus a few moments after he got

33

on. He described it variously as "arguing," "hollering" and "noise." He said it continued, both when the bus was moving and while it was stopped, all the way to Oakley Boulevard and that it was still going on when the passenger got off at Oakley.

The defendant protests the use of the word "quarreling" in reference to the argument. It explains that an argument is not a quarrel and asserts that there was not "a word of testimony" to support our "finding" which, it says, contradicts Letsos' own specific testimony that he did not hear any fighting in the rear of the bus. It further asserts "there was not a word of testimony that the participants in the argument were belligerent or fighting."

The record shows: At one point in his cross-examination Letsos said that he did not hear any fighting while the trip was in progress. But there was testimony from which the jury could have found that quarreling and fighting developed in the back of the bus before the shots were fired. The noise in the back increased concurrently with the altercation in the front and the defendant itself brought to the jury's attention that Letsos described this noise as a fight. While cross-examining Letsos, the defendant's attorney tried to impeach him by reading questions asked of him and answers made by him in his deposition. Among them were these:

"Question: Then was this question put to you? 'Question: What happened then?' And did you answer: 'There was a fight back in the bus. We didn't do anything.' Was that question put to you and did you make that answer in July of 1963?

"Answer: Yes, I did."

Letsos also said in his deposition that he thought there was a fight in the back of the bus. He went on to testify that the noise was such that it caused him

34

to turn his head around just before he was shot. It was stipulated that if the court reporter who attended the deposition had been called as a witness he would have testified that Letsos was asked the above questions and made the answers attributed to him.

The defendant further asserts that there "was not a syllable of testimony that there was any connection whatsoever between the loud talk in the rear of the bus and the shooting in the front of the bus."

The record shows: The defendant's driver testified that the passenger who stepped on the white man's foot "stumbled all the way up to the door" before he got off at Oakley. The jury could have inferred that this man, whose conduct triggered the whole melee, came from the noisemakers in the back of the bus. More importantly, this same witness testified that he thought a passenger who had been in the back of the bus shot Letsos. He saw this man come down the aisle, inject himself into the altercation at the front and strike one of the two white men. The jury could have inferred, with good reason, that this quarrelsome individual was one of those who had been shouting and arguing in the back of the bus and that if the disturbance there had been arrested and the turbulent participants subdued, the shooting might not have occurred.

The evidence created factual issues for the jury's resolution. No complaint is made about the court's rulings on evidence, the plaintiff's argument to the jury or the court's instructions. In an errorless trial, the jury resolved the issues in favor of the plaintiff. The trial court approved the jury's verdict. The court found that the evidence favorable to the plaintiff was sufficient to allow the verdict to stand and denied the defendant's motion for judgment notwithstanding the verdict. We reaffirm our concurrence in the court's judgment.

The Petition for Rehearing is denied.