The Chicago, Milwaukee and St. Paul Railway Company

*v.*

Eliza S. Halsey, Admx.

*Filed at Ottawa March 29, 1890.*

1. Negligence — *contributory negligence* — *want of due care in approaching a railway crossing.* One who, failing to use due care, blindly walks into a danger that the observance of due care would have enabled him to avoid, is no less guilty of contributory negligence than he who, by the observance of due care, could extricate himself from danger, and fails to make any effort for his personal safety, and because thereof is injured.

2. So on approaching a railroad crossing, one is bound to know that it is a place of danger, and he must have that regard to the sights and sounds warning him of an approaching train, that a man of ordinary caution, under like circumstances, would have.

3. Where the question is whether the person killed by a locomotive at a railroad crossing observed due care to avoid injury to himself in going upon the railroad track in the manner and at the time and place that he did, and the circumstances in evidence put the conduct of the railway company and the deceased fully and fairly before the jury, they should be left to determine, from the circumstances, whether the deceased observed due care for his personal safety, without any reference whatever to the fact that there was no direct evidence of what he did at the time of the injury.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. Joseph E. Gary, Judge, presiding.

Mr. E. Walker, for the appellant.

Messrs. Flower, Smith & Musgrave, for the appellee.

Mr. Justice Scholfield delivered the opinion of the Court:

The questions presented upon this record, in the arguments before us, arise upon an instruction given on substantially the following facts in evidence before the jury:

Appellant operates a double track railway, running north and south, between Chicago and Evanston, for suburban

service. The Chicago and Northwestern Railway Company also operates a like railway, parallel with that of appellant, and some 50 feet to the west of it. The village of South Evanston lies south of and adjoining Evanston, and these lines of railway pass through it. Greenleaf street, of South Evanston, runs east and west, crossing the tracks of these railways at right angles. Dempster street, of this village, also runs east and west, crossing these railway tracks at right angles. There is a railway station at this crossing, which is about 1540 feet north of the Greenleaf street crossing. There is also a station for South Evanston, which is about one-fourth of a mile south of the Greenleaf street crossing, and about one mile south of Evanston station. There are numbers of street lamps at and north of the station at Dempster street crossing, but none south of that station and north of Greenleaf street crossing. Benson avenue is also a street of South Evanston, running north and south, parallel with these lines of railway, and at a distance of a few hundred feet west from the tracks of the Chicago and Northwestern Railway Company. Appellant's engines used in drawing its suburban trains are constructed to be operated in either direction, having, however, in the rear, only what is described as a tail or switch-light, with but one-half the illuminating capacity of the ordinary head-light, and they are operated from Chicago to Evanston with the ordinary head-light in front, and from Evanston to Chicago without being turned, with this tail or switch-light in front. There is a bell of the usual weight and quality upon all of these engines, and appropriate machinery for operating it automatically. There is in force an ordinance of the village of South Evanston requiring that "every locomotive engine, railroad car or train of cars running in the night time in the said village, shall have and keep a brilliant and conspicuous light on the forward end, and, while backing up, on the rear end of such locomotive engine." The village of South Evanston has a population of about 2000, of which about 1200 are on

the west side and 800 on the east side of the tracks. Green-leaf street crossing was used, but not so largely as the crossing of Lincoln avenue, the parallel street next south, which was better improved.

On the evening of the 11th of March, 1887, after dark, the intestate, George Halsey, who was twenty-one years old, left the residence of his mother, the appellee, on Benson avenue, in company with his sister, Eliza, who was about fifteen years of age, for the purpose of escorting her, along Greenleaf street, across the railway tracks, to an entertainment at the house of a friend, beyond those tracks. Their line of travel lay east, along the north side of Greenleaf street, until near the railway tracks, then south across the street to its south side, then east across the tracks. But one witness saw them, after leaving appellee's residence, before they got upon the track of appellant's road, and he met them about five feet from the Northwestern tracks. At this time a train had just gone north on appellant's road, which passed a train on appellant's road coming south, about 50 feet north of the Greenleaf street crossing, and the intestate and his sister were struck by this train, and he instantly killed, and she badly though not permanently injured. The fireman saw them just as they were struck. No one else saw them at or immediately before that occurrence. The sister has no recollection of anything that occurred after she left appellee's house. The witness who met them, and the brakeman who saw them just as they were struck, testify to nothing respecting them, save the facts of thus meeting and seeing them.

Negligence is alleged in running at a reckless speed; in not ringing a bell or sounding a whistle; in not having gates or bars or watchman at street crossing; and in running the engine backward at a dangerous speed, without sufficient headlight, in violation of village ordinance.

Special interrogatories were propounded to the jury, and they found in response thereto, among other things, as follows:

Q. "Upon which track of the defendant was the train moving that struck the deceased, and in which direction was said train going?

A. "On the west track, moving south.

Q. "Do you find that such train stopped at Dempster street station of the defendant's road, and how far north of Greenleaf street was Dempster station?

A. "Yes. About 1540 feet.

Q. "Do you find, from the evidence, that the defendant's train that caused the injury was being run at its regular time-card rate of speed at the time of the injury?

A. "Not at that point.

Q. "What was the rate of speed between Dempster station and South Evanston station, as fixed and directed by the time-card?

A. "About thirty miles per hour.

Q. "At a distance of 145 feet from the place of accident, at what distance could the deceased have seen the approaching train had he looked in that direction?

A. "About 1687 feet, in ordinary circumstances.

Q. "At a distance of 50 feet from the place of the accident, how far north could the deceased have seen the approaching train had he looked in that direction, and for the purpose of observing if a train was approaching?

A. "About 1875 feet, under ordinary circumstances.

Q. "At a distance of 20 feet from the place of accident, how far north was the approaching train that caused the injury, visible?

A. "About 1875 feet, under ordinary circumstances.

Q. "Is there any evidence that the deceased looked in the direction of the approaching train before attempting to cross the track upon which the accident occurred?

A. "No.

Q. "Could the deceased have seen the approaching train before attempting to cross the defendant's tracks had he exercised

ordinary or reasonable care or prudence, as, by looking in the direction of the approaching train?

A. "Yes, under ordinary circumstances.

Q. "Do you find that at the time of the injury there was a bell upon the defendant's engine, being rung automatically?

A. "We do not believe, from the evidence, that the bell was ringing.

Q. "Do you find that there was a lamp upon the said defendant's engine that struck the deceased, of the ordinary size and capacity of lamps used upon such engines of the defendant and other railroad companies, and was such lamp lighted at the time of the injury, and how far north of Greenleaf street could such light be readily seen by any person standing west of and near the defendant's west track, and looking for and in the direction of such engine?

A. "We believe that the lamp was not of the ordinary capacity of passenger engine lamps. It was lighted at the time, and under ordinary circumstances could have been seen at Dempster station, if in good order."

The witness who met the intestate and his sister, testified that he saw the train going north, and also that he saw the train going south as it started up at the station at Dempster street; that there was no difficulty in seeing the light of the engine that far, and that he heard the bell ringing upon the engine before it reached Greenleaf street. There is testimony given by other witnesses that there was nothing to obstruct the view between Greenleaf street crossing, and also between the respective distances west of that crossing (mentioned in the interrogatories responded to in the special verdict) and the station at Dempster street, on that evening, and that the headlight used on the engine causing the injury could, on that evening, be plainly seen from Greenleaf street crossing, and the several points west of that crossing mentioned in the interrogatories responded to in the special verdict, at the station at Dempster street. There is no evidence tending to prove

that anything occurred to prevent the intestate from looking in the direction of the Dempster street station as he approached the Greenleaf street crossing.

There is a direct conflict in the evidence as to the ringing of the bell, but there is no evidence tending to show that the intestate could not have heard it, by listening, before he passed upon the track of the railroad, if it was rung. There is evidence that the north and south bound trains usually passed each other at Evanston, and there is also evidence tending to prove that an ordinary person could not, from Greenleaf street crossing and vicinity, distinguish the light used on appellant's engine on that evening, while the engine was at or north of Dempster street station, from the street lamps in that vicinity, but there is no contradiction in the evidence that there are no street lamps south of Dempster street station. The evidence shows that the intestate had long resided in the vicinity of this crossing, and that the south bound train was, on this evening, about on its usual and proper time.

In the first instruction given at the instance of the appellee, the jury were, among other things, told, that "in the absence of direct evidence as to the conduct of the deceased at the time of the accident, if the facts which, from the evidence, the jury find to be the facts in the case, are consistent with the plaintiff's theory that the deceased was in the exercise of ordinary care, then the jury may find, if they so believe, from the evidence, that the conduct of the deceased was not such as to bar plaintiff's recovery in this case; and if there is no evidence as to the conduct of the deceased, then, in the absence of any evidence that the deceased was himself negligent, the jury are to determine, from all the evidence, whether the deceased exercised such care for his personal safety as an ordinarily prudent man would under similar circumstances." This was clearly erroneous, and calculated to mislead the jury. It was not an element for the consideration of the jury that there was no direct evidence of what the deceased did merely at the

time of receiving the injury.   Nor should the inquiry in regard to contributory negligence by the deceased, have been directed only to the evidence of what the deceased did at the *time of receiving the injury.*   The claim of appellant is not that he *then* failed to do what a man of ordinary caution would have done to avoid injury, but that he failed to do what a man of ordinary caution, under like circumstances, would have done to avoid placing himself in a position from which he could not escape without being injured.   One who, failing to observe due care, blindly walks into a danger that the observance of due care would have enabled him to avoid, is no less guilty of contributory negligence than he who, by the observance of due care could extricate himself from danger, fails to make any effort for his personal safety, and because thereof is injured. (*Abend* v. *Terre Haute and Indianapolis Railroad Co.* 111 Ill. 203.)   One approaching a railroad crossing is bound to know that it is a place of danger, and he must give that attention to the sights and sounds warning of an approaching train that a man of ordinary caution, under like circumstances, would give. If he shall permit himself to become absorbed in thought about other matters, and, in consequence, oblivious of his present surroundings, he will do so at his peril.   The circumstances in evidence here put the conduct of both parties, so far as affecting the question at issue, fully and fairly before the jury, and the jury should have been left to determine, from all those circumstances, whether the deceased observed due care for his personal safety, without restricting their attention to the fact and the effect of the absence of direct evidence of what he did at the immediate time of the injury.   *Illinois Central Railroad Co.* v. *Cragin,* 71 Ill. 183; *Chicago and Atlantic Ry. Co.* v. *Carey,* 115 id. 115.

For the error in giving this instruction, the judgments of the Appellate and Superior Courts are reversed, and the cause is remanded to the Superior Court for a new trial.

*Judgment reversed.*