## Chicago & N. W. Ry. Co. v. Eleanor B. Weeks.

1. RAILROADS—*As Carriers of Passengers—What Constitutes One a Passenger.*—The relation of carrier and passenger begins only when the holder of a ticket puts himself in charge of the carrier for the purpose of being conveyed to his destination; but if he is passing from the office or place of business of the company where he has purchased his ticket to his seat in the cars on the premises belonging to the company and connected with the railroad, under the direction, expressed or implied, of the agent of the company, given to him as to a passenger with whom the company has made a contract of conveyance, he is, while so passing to the train, a passenger, and as such entitled to a safe opportunity to enter the cars at the proper time.

2. SAME—*When a Person Becomes a Passenger.*—A person does not become a passenger of a railroad company until he has put himself in charge of the company and has been expressly or impliedly received by the company. It is not enough that such person may have an immediate intention to become a passenger; and if on arriving late at the station he finds that if he takes the time necessary to approach the train he desires to take in the ways openly and obviously provided by the company for safe passage he will not be able to reach it before it starts, and takes a short cut by crossing the tracks, and is injured in consequence, he can not be rightfully considered to have become a passenger.

3. SAME—*A Person Intending to Become a Passenger Must Present Himself in a Proper Way.*—A person intending to take passage upon a railroad train, who is proceeding without precaution for his safety, toward a point directly in front of an incoming train, does not present himself in a proper way to become a passenger.

4. CONTRIBUTORY NEGLIGENCE—*Who is Guilty of.*—A person who fails to observe ordinary care and blindly walks into a danger which

the observance of due care on his part would have enabled him to avoid, is no less guilty of contributory negligence than one who, by the observance of due care, could extricate himself from a danger and fails to make any effort to do so, and by reason of such lack of effort is injured.

5. ORDINARY CARE—*Duty of a Person Approaching a Railroad Crossing.*—A person approaching a railroad crossing is bound to know that it is a place of danger and that he must give that attention to the sights and sounds warning him of approaching trains that men of ordinary caution under like circumstances would give. And if he permits himself to become absorbed in thought about other matters, and consequently becomes oblivious of his surroundings, he will do so at his peril.

Trespass on the Case, for personal injuries. Appeal from the Superior Court of Cook County; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Reversed, with a finding of facts. Opinion filed January 21, 1902.

**Statement.**—This is a suit to recover damages for personal injuries. Appellee suffered the loss of a portion of the right leg below the knee, her foot having been run over by one of appellant's passenger trains at the Ravenswood station. A jury returned a verdict in her favor, and from the judgment rendered in accordance therewith this appeal is prosecuted.

The accident occurred May 17, 1898. At that time appellant's tracks had been recently elevated. The station building at Ravenswood was about in the center of the block between Sunnyside and Wilson avenues. These avenues run east and west at right angles with the railroad, Sunnyside being south and Wilson north of the station, and are spanned by viaducts over which the trains pass. The station platforms extended the whole length of the block from Sunnyside avenue to Wilson avenue, one on each side of the railway tracks, of which there were three. There were steps leading up to each of these platforms from both Wilson and Sunnyside avenues. There were also other steps leading to the platforms from the center. The platform west of the tracks, where the north-bound suburban trains stopped to let off and receive passengers, was entirely open, without roof or building of any kind. Extending across the tracks between the platforms and

directly in front of the station, was a wide plank walk. Passengers intending to leave or about to take trains were in the habit of crossing the tracks freely from platform to platform at any point, in the same manner as where railway tracks are on a level with the streets. At the time of the accident, however, there was no necessity of so doing, the subways under the viaducts and steps ascending therefrom to either platform, affording a safe means of reaching them without crossing any tracks. One of appellee's witnesses says:

"In going from the depot to take a north-bound train, if you are in the waiting room, the most obvious way would be to go directly across the tracks, or to go along the platform to one of the avenues, either Wilson or Sunnyside, pass down the steps and pass under the viaduct or approach, and come up on the other side."

Appellant runs over its tracks fast express trains which do not stop at Ravenswood, as well as local or suburban trains which do stop. When approaching from a distance, there is, it is said, no noticeable difference in the appearance of these trains, unless attention be given to the speed at which they approach.

Appellee lives near St. Louis, but she had resided as a student at Evanston, a few miles north of Ravenswood, for something more than two years, graduating there in 1896. At that time she was in the habit of visiting a cousin at Ravenswood, and used to take the local trains back and forth between Ravenswood and Evanston. She returned to Evanston in the spring of 1898 to take post graduate work preparatory to teaching. She had been there about two weeks when the accident occurred. During that time she thinks she had gone to Ravenswood once and perhaps twice.

The day of the injury appellee bought at Evanston a round trip ticket, and arrived at Ravenswood at about two o'clock P. M. She went from the station to her uncle's residence, about three and a half blocks east of the railroad. She left the house after five o'clock, accompanied by her cousin, and went toward the station, intending to take a

local train to Evanston at 5:40 P. M.   Having errands to do, they stopped at several stores near the station, and coming out of one of these near Sunnyside avenue, appellee looked south along the track and saw what she supposed was her train coming in the distance, as she states, " just a black speck and smoke." It was in fact a fast express, not stopping at Ravenswood.   Remarking that it was her train, she bade her cousin and a young lady they had just met " good-bye," and ran across the street and up the steps leading from Sunnyside avenue to the platform east of the railway tracks.   She states that she did not know at that time of any steps leading from Sunnyside avenue to the west platform, to which she was bound and at which the north-bound suburban trains stopped.   That stairway was west of the subway, and not visible to persons on Sunnyside avenue east of the tracks, and no notice was posted to indicate to strangers that it was there.   She made no inquiries.   There was nothing to obstruct her view, neither smoke nor intervening objects, and it was perfectly light and clear.   She says that when she reached the platform at the head of the steps, she glanced in the direction of the approaching train as she went on.   She saw it was so far off—she says it looked about two blocks at least—that she thought she had plenty of time, and felt relieved.   She went on more slowly toward the west platform, crossing the tracks in a diagonal direction, thus turning partly away from the train which was approaching from the south, and directing her own course toward the northwest.   When she reached the last track, the one nearest the west platform to which she was going, or was just on the track—she does not remember whether she was on it or just stepping on it—she looked up. She says she does not know what attracted her attention, " whether it was a whistle or what it was, but I looked up and the train was so close to me that it frightened me terribly.   It looked like it was almost on me, and I fell across the tracks, and I just had to drag myself across just as quickly as I could.   I don't remember any particular sensation but just fright.   I dragged myself across as quickly

as I could, and just the one foot was caught under the train." She supposed only the sole of her shoe had been struck until she saw that her foot was cut off.

.It is agreed between the attorneys that the place where she was hurt was about forty feet north of where she started to cross, and it appears that the space between the platforms was about thirty-five feet. The distance appellee traversed, therefore, in crossing, was about equal to the hypothenuse of a right angle triangle, the other two sides of which were respectively about thirty-five and forty feet. If, therefore, instead of going diagonally, she had gone straight across the tracks upon reaching the platform, she would, at the same rate of speed, have had time to get across safely. If the approaching train had been, as she supposed it to be, the local due to leave Ravenswood at 5:40 p. m., instead of the fast express which passed that station five minutes earlier, she could have taken it from the east side of the train as well as from the station platform, there being no gates on the car platforms. In other words there was no necessity for her to cross the track upon which she was injured in order to board a north-bound suburban train. That west platform was not more than an inch or two higher than the tracks, and it was about as easy to board a train from one side as the other.

It appears from the testimony of the two young ladies who were with appellee when she saw the train approach-ing, that as she was ascending the steps and just reaching the platform, they called out to her, "That is the fast train—that is the fast train." Some boys near by also called to her to. the same effect. Appellee says, however, that she did not hear any such calls, owing probably to the noise of the coming train. Her cousin states that appellee was told when she first saw the train that she would have plenty of time, it was so far off.

The engineer of the train testifies that he first saw appellee when she was on the east platform at the top of the stairs, and when his train was more than a block away, south of Montrose Boulevard; that she was then running

and just leaving that platform; that he thought she was going ahead of the train to the other platform, and he "gave her a warning whistle;" gave four or five sharp whistles; that when she was close to the east rail of the middle track he gave another whistle; that she stopped then but started again immediately, and he then gave another whistle, shut off the steam and applied his emergency brakes. He had made no effort to stop before because he had given the warning and expected her to keep out of danger. When he applied the brakes he was just south of the Sunnyside avenue viaduct.

A. W. PULVER, attorney for appellant; E. E. OSBORN and LLOYD W. BOWERS, of counsel.

DARROW & THOMPSON, attorneys for appellee.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

Appellant's attorney states the contention in the case as follows: "There were two essentials to the recovery of the plaintiff in this case. It was necessary for her to show by a preponderance of evidence, first, that her injury was caused by the negligence of the defendant, as alleged in the declaration; and second, it was necessary for her to show by a clear preponderance of evidence that she was, at and just before the time she received the injury, exercising ordinary care for her own safety.

It is conceded by appellee's attorney that this is "a correct statement of the law which governs the case," and it is insisted that these essentials to recovery are met by the evidence.

It is claimed in behalf of appellee that she was a passenger of the defendant railway company when hurt, and that therefore, as said in C. & E. I. R. R. Co. v. Chancellor, 165 Ill. 438, "appellant was bound to exercise the highest reasonable and practicable degree of care for her safety. C. & A. R. R. Co. v. Pillsbury, 123 Ill. 9; C. & A. R. R. Co. v. Arnol; 144 Ill. 261. If she did not sustain the rela-

tion of passenger or intended passenger, then only ordinary care was required of appellant." The rule as stated in the Arnol case, above cited, is that " ordinary carriers of passengers for hire, while not insurers of absolutely safe carriage, are held to the exercise of the highest degree of care and skill practicably consistent with the efficient use and operation of the mode of transportation adopted."

As to what constitutes one a passenger, so as to entitle him or her to adequate protection when approaching or leaving a train, the decisions are not entirely harmonious. It is said in Buswell on the Law of Personal Injuries, quoted by appellee's attorneys in their brief, that " the relation of carrier and passenger begins only when the holder of the ticket puts himself in charge of the carrier for the purpose of being conveyed to his destination; but if he is passing from the office or place of business of the company where he purchased his ticket to his seat in the cars on the premises belonging to the company and connected with the railroad, under the direction, expressed or implied, of the agent of the railroad, given to him as to a passenger with whom the railroad has made a contract of conveyance, he is, while so passing to the train, a passenger, and, as such, entitled to a safe opportunity to enter the cars at the proper time."

We are inclined to agree with appellee's attorney that this is a correct statement of the general principle by which, in a given case, the question whether a party injured is or is' not entitled to be considered a passenger, must be determined. It must appear that such party has actually put him or herself in charge of the carrier, and has been received under the latter's direction, express or implied. It is not enough that he has purchased a ticket, nor that he is upon the premises of the railroad company. Both these conditions may, and often do, exist with one who has not at the time placed himself, in any sense, in charge of the carrier or under its direction. It is a matter of common knowledge that parties using suburban trains generally purchase commutation tickets, good for a speci-

fied time or number of rides, which are carried on the person at all times. See C. & G. T. Ry. Co. v. Stewart, 77 Ill. App. 66–69. Such persons may be, and doubtless frequently are, upon the premises of a railroad company, and at its stations, when they have no intention whatever of becoming passengers at the time. The same rule is thus stated in I. C. R. R. Co. v. O'Keefe, 168 Ill. 119: "One does not become a passenger until he has put himself in charge of the carrier, and has been expressly or impliedly received as such by the carrier;" and it is there said, " both parties must enter into and be bound by the contract." Nor is it enough that one may have an immediate intention to become a passenger. If any one arriving late at a station, and finding that if he takes the time necessary to approach the train he desires to take in the ways openly and obviously provided by the railroad company for safe passage he will not be able to reach it before it starts, and takes a short cut, climbing over a fence or other obstruction plainly erected to prevent persons from crossing tracks, and is injured in consequence, he could not be rightfully considered to have become a passenger. Instead of placing himself in charge of the carrier, he would be willfully ignoring the means it had provided for the safety of those who do place themselves in its charge. It does not contract to receive him as a passenger in any such way, either expressly or by implication. This is the view taken in Webster v. Fitchburg R. R. Co., 161 Mass. 298, 300, cited in the O'Keefe case, last above referred to. The Massachusetts court says: "In the present case, after the arrival of plaintiff's intestate on the defendant's premises, there was no time when he presented himself in a proper manner to be carried. He was all the time running rapidly, without precautions for his safety, toward a point directly in front of an incoming train. He did not put himself in readiness to be taken as a passenger and present himself in a proper way;" and it is further said: "The law will not imply a contract by a railroad company to assume responsibility for one as a passenger

from such facts as appear in this case." There the deceased had in his pocket a ten-trip ticket. In Hutchinson on Carriers, Sec. 562, it is said that "unless some contract, either express, or implied from the circumstances, can be shown, it is difficult to see how the relation can be established. The mere intention to take passage upon the carrier's vehicle ought not, certainly, to have that effect, under any circumstances." The cases, I. C. R. R. Co. v. Treat, 179 Ill. 576; Penn. Co. v. McCaffery, 173 Ill. 169; Chesapeake & Ohio R. Co. v. King, 99 Fed. Rep. 251, cited by appellee's attorneys, are not in conflict with the views above stated. Our attention has been called, in the briefs filed herein, to C. & E. I. R. R. Co. v. Jennings, 89 Ill. App. 335, which, it is claimed by appellee's attorneys, sustains the position that appellee stood to appellant in the relation of passenger when hurt. Since the briefs in the case before us were filed, however, our Supreme Court has held that the deceased in that case was not received as a passenger, and has reversed the judgment. C. & E. I. R. R. Co. v. Jennings, 190 Ill. 478. In the opinion of the Supreme Court, which contains a very satisfactory discussion of the question, it is said: "The company has a right to know that the relation and duty exist, and the passenger must be at some place provided by the company for passengers, or some place occupied and used by them in waiting for or getting on trains."

In the case at bar appellee was not in such position when injured. She was all the time proceeding, without precautions for her safety, toward a point directly in front of an incoming train, and did not present herself to become a passenger in a proper way. The railroad company had done nothing to invite her to become a passenger " by rushing into danger in such a way." Webster v. Fitchburg Railroad, *supra*. If it be said that the planking laid across between the tracks at the station should be regarded as an invitation to cross, she was not using that planking, but was crossing where no such invitation existed. If she had been on the planking, it is quite possible she might not have

stumbled on the rail and fallen, as she did, almost under the train, and had she taken the time to go that way, the train would have passed before she could have gotten into danger.

It is argued by appellee's attorneys that the railroad company was not exercising the highest degree of care, nor even ordinary care, but was guilty of gross negligence. This is shown, it is said, in the speed of the fast train by which appellee was injured—thirty-five or forty miles an hour. Such speed was, however, permitted by city ordinance, the tracks being elevated. It was sought to introduce the ordinance in evidence, but it was ruled out, erroneously, as we think, upon objection of appellee's counsel. It was a fact of which persons using or observing the railroad could not have been ignorant, that fast through trains were running over appellant's tracks at frequent intervals. Appellee's witnesses testify to the fact and their knowledge of it. She herself states that prior to the elevation of the tracks, when she first went to Evanston, she had frequently gone to Ravenswood, and became acquainted with the way trains ran there. It was yet five minutes before the time when the next local or suburban train which appellee intended to take would be due. There were no grade crossings, no reason that was apparent why fast trains should not be so run. The tracks were elevated with that in view, as may be inferred from the ordinance. It would be impossible for any through line of railroad to conduct its business and accommodate the public without fast trains, and of this we may take judicial notice. This is not a case where a train is run at full speed past a station where a passenger train is receiving and discharging passengers. There was no train there and none was due to stop there for five minutes.

It is said the company should have placed a notice where appellee could see it from the east side of the subway on Sunnyside avenue, to indicate the existence and location of the stairs leading from said avenue to the west platform; that fences should have been placed between the tracks and platforms to prevent persons from crossing there. These

are things which might properly be done in the light of the present case.   But it is not pointed out in what way their omission constituted negligence *per se* on the part of appellant.   It appears from photographs in evidence that any one standing where appellee stood after ascending the steps to the east platform, could see by simply looking across the tracks that there was a similar stairway the other side of the viaduct and subway which led to Sunnyside avenue from the west platform.   It has never been held, so far as we are advised, to be negligence not to erect fences and prevent people crossing tracks at a station where there is, as at Ravenswood, an unobstructed view in either direction along a perfectly straight track, and other means are provided to reach the platforms.

The main ground upon which it is sought to sustain the charge of negligence against appellant, is that the engineer did not at once stop his train or slacken its speed when he first saw appellee as she came up on the east platform, when he believed from her conduct she then intended to cross. The engineer's statement is that when he saw that she did not stop he gave a warning whistle—four or five sharp whistles—just as she was leaving the platform, running; that appellee did stop when close to the east rail of the middle of the three tracks, and then immediately started again, whereupon he gave another whistle, shut off steam and applied his emergency brakes.   He states that he supposed his warning whistle would be sufficient to cause her to stop. He had a right, in our opinion, to so believe.   Appellee was then in a position of safety.   She was going in a diagonal direction away from the approaching train.   According to his statement, and in this he is not contradicted, she did stop, but went ahead again, and then he used every effort to stop his train.

It is stated in appellee's brief that "the other witnesses in the case, both by the company and by the plaintiff, fully corroborate the main facts of the engineer's statement." These facts are not, therefore, in dispute, and do not tend to show, in our judgment, a want of proper care and caution

in the operation of the train by the engineer under the circumstances.   On the contrary, they indicate that he used such reasonable precautions as the situation then seemed to demand.   To charge him with negligence it must appear that he knew, or ought to have known, appellee would place herself in front of his rapidly moving train, " at least long enough before the injury inflicted to have enabled him to have formed an intelligent opinion as to how the injury might be avoided and apply the means."   C., B. & Q. R. R. Co. v. Johnson, 103 Ill. 512–520.   But the engineer had the right to assume appellee would heed the warning whistle, and not attempt to pass in front of a fast through train which did not stop at that station.   She had looked back and seen the train coming.   There was no reason apparent to the engineer why she should be in such haste and take the enormous risk of passing in front of what her counsel calls " a cannon ball," and which, by exercise of ordinary care, she could have discovered to be a fast train.   It is said that appellee believed and had every reason to believe that it was her train just pulling into the station, and that it would stop there, and would be " running slowly or stop altogether at the point where she stopped, and thought she had ample time."   But the engineer had no means of knowing what appellee was thinking, and can not be charged with negligence for want of such knowledge.

It is contended that appellee was in the exercise of ordinary care for her own safety.   It is said she acted as ninety-nine persons out of a hundred would have done under like circumstances.   Appellee is intelligent and has related the facts as she remembers them.   It is not strange, in view of what occurred, that she has not an entirely distinct recollection of every incident preceding the injury.   It is doubtless true she was misled by the hastily formed impression that the approaching train was the local instead of the express. She had also a feeling that it was desirable for her to reach the west platform so as to be there ready to take the train when it arrived.   But she had seen it approaching, once in the distance and again when she glanced back at it from

the platform when it was over a block away. She hurried to pass in front of it, always a dangerous and imprudent thing to do, especially for a lady whose skirts may catch on a rail or cause her to stumble as did appellee. Had she gone straight across, instead of diagonally, she would probably have escaped. Had she not stumbled and fallen on the track, she might have gotten across in safety. She took the chances of such a misfortune. With knowledge of the approaching danger she went blindly on, her back toward the train, governed entirely by hastily formed original impressions, which she made no effort to verify. In this she certainly failed to exercise ordinary care. Taking the chances, she met with an accident—the risk of which she had assumed—and fell across the track in front of the engine, frightened, as she well might be, at the terrible danger. She looked up to see where the train was when she was already on the track in front of it, where, if it was fright that caused her to fall, the fright was the result of her own negligence in failing to look before instead of after she had stepped into such imminent peril. In C., M. & St. P. Ry. Co. v. Halsey, 133 Ill. 248–254, the court, by Mr. Justice Scholfield, says : " One who, failing to observe due care, blindly walks into a danger that the observance of due care would have enabled him to avoid, is no less guilty of contributory negligence than he, who, being able by the observance of due care to extricate himself from danger, fails to make any effort for his personal safety, and because thereof is injured. Abend v. Terre Haute & I. R. Co., 111 Ill. 203. One approaching a railroad crossing is bound to know that it is a place of danger, and he must give that attention to the sights and sounds warning of an approaching train that a man of ordinary caution under like circumstances would give. If he shall permit himself to become absorbed in thought about other matters, and in consequence oblivious of his present surroundings, he will do so at his peril."

Appellee has suffered a very great misfortune, a severe penalty for momentary thoughtlessness; but the conclusion is, we think, inevitable that she was injured in consequence of her own negligence, and the court must say so as a mat-

ter of law.   U. S. Express Co. v. McCluskey, 77 Ill. App. 56-59, and cases there cited.

The conclusion stated makes it unnecessary to consider other points raised by counsel.   The judgment of the Superior Court must be reversed, with a finding of facts. Reversed.