## Thomas Reed v. William R. Manierre.

### Gen. No. 12,215.

1. SAFE PLACE TO WORK—*when instruction as to, misleading.* The instruction following held misleading, as calculated to create the impression that the defendant owed no duty with respect to the safety of the floor upon which the plaintiff was working:

"The court instructs the jury as a matter of law under the evidence in this case, William R. Manierre and Thomas Reed did not stand in the relation of master and servant, and the said Manierre did not owe to the said Reed a master's duty to furnish a reasonably safe place for a servant to work in."

2. INSTRUCTIONS—*when may assume facts.* An instruction may properly assume the existence of facts where the evidence with respect to such facts is conclusive and uncontroverted.

3. CONTRIBUTORY NEGLIGENCE—*when plaintiff guilty of, in falling into elevator shaft.* Held, from the particular evidence in this case that the plaintiff, whose injury resulted from his falling into an elevator shaft which was unguarded, was guilty of contributory negligence as a matter of law.

Action in case for damages, etc. Appeal from the Circuit Court of Cook County; the Hon. FREDERICK A. SMITH, Judge, presiding. Heard in this court at the March term, 1905. Affirmed. Opinion filed January 4, 1906.

KNIGHT & BROWN, and JACOB L. BAILY, for appellant.

O. W. DYNES, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

Appellant sued appellee in case for damages alleged to have been caused by appellee's negligence. The pleadings consist of the declaration and the general issue. The decla-

ration consists of three counts. In the first count it is averred, in substance, as follows:

January 7, 1901, William R. Manierre was the owner and in possession of Central Warehouse at 2–8 Rush street, Chicago; the western portion was designated by United States Government as a bonded warehouse, where Manierre permitted importers to store for hire imported goods, where they remained until released from bond.

Plaintiff was assisting the weigher for the United States Government weighing goods there in bond. Within said building there was a freight elevator and shaft of large dimensions, extending from the basement through the first floor to the top of the building. Said elevator was equipped for hoisting or lowering goods, and said shaft was enclosed, except that there was an opening on each floor at the north and south side thereof. It became necessary for Reed, in his employment, to enter and work on the first floor, and it was the duty of defendant to cause said elevator shaft and entrance to be in a safe condition, so that plaintiff, in his employment, and exercising care, could work near the shaft. Yet the defendant permitted said shaft to remain without any gate, etc., and in such a defective condition that plaintiff, in the exercise of due care, fell into said shaft, and received severe fractures, shocks, etc.

The negligence averred in the second count, is the permitting the first floor of the building to remain in a dark and dangerous condition; and that averred in the third count is the permitting the entrance, at the first floor, to an elevator shaft, to remain without any gate, door or other obstruction, and the permitting the said floor to be and remain dark. The jury found appellee not guilty and judgment was rendered on the verdict.

The argument of counsel for appellant is mainly directed to criticism of instructions 8 and 19 given by appellee's request, and argument as to the duty which it is claimed appellee owed to appellant. We will first consider, as concisely as may be, the facts in evidence, testified to by appellant's witnesses.

Appellee was the owner of Central Warehouse A, in the city of Chicago, the western part of which, known as Central Warehouse B, was bonded to the United States by appellee, by a writing obligatory executed by appellee and his surety to the United States, May 25, 1899. One of the conditions of appellee's bond was that he should comply, in all respects, with the requirements of the warehousing laws and regulations of the treasury department relating thereto. Central Warehouse B is 104 feet in length from north to south, and 42 feet in width from east to west, and is seven stories high. It is separated from the part of the building east of it, which the witnesses refer to as the free part, by a corrugated iron partition from the ground to the roof of the building. There was an entrance from the free part to the bonded part on the first floor, through the iron partition, and a few feet south of the northeast corner of the floor. The door there was a sliding door closed by a government lock. Entrance to this door was only through the office of the government storekeeper, which was just east of the door in the free part of the building. On each of all the other floors, in the bonded part of the building, there was a door in the iron partition, which was kept closed by a heavy iron bar across the door from jamb to jamb, so that the door could only be opened in the bonded side. Gleason, the government storekeeper and inspector of customs, opened the bonded part of the warehouse at eight o'clock in the morning and closed it at five o'clock in the afternoon. He testified that it was his duty to see that the entire bonded house was thoroughly closed each night, before going home, and to open it in the morning, when necessary. He further testified: "I was in charge of the warehouse, for the government, all the time. Upon my order to receive, the warehouse employees handled the goods. No government official had anything to do with the handling of the goods. The employees of the warehouse did all the work. I looked over the inventory of the goods before they were piled. The foreman of the warehouse oversaw the piling of the goods, and an employee of the warehouse operated the elevator."

By "warehouse employees" is meant, as we understand, appellee's employees. They, however, could only work under the supervision of the storekeeper. Section 973 of the regulations of the treasury department provides: "All labor shall be performed under the supervision of the storekeeper in charge," and section 972 of the regulations provides: "All the doors and other fastenings of bonded warehouses must be secured by custom locks of different pattern from those of the proprietor." There was a freight elevator shaft in the bonded part next west of the iron partition and some distance south of the entrance to the first floor heretofore described. There were folding iron doors opening outward on each of the north and south sides of the shaft, which afforded entrance to the elevator platform when at that floor. In the basement, on the south side of the elevator shaft, there was a door which was kept locked by the government, and to unlock it, one on a floor west of the partition would have to go down in the elevator. This door was locked on the day of the accident, and the key was in the possession of Gleason, the government storekeeper.

At the time of the accident there were piles of sacks of tea from 8 to 10 feet high on the first floor of the bonded part, along the walls of and in the centre of the room. The diagram (see p. 131) is substantially in accordance with the evidence. The place marked "Entrance" is the only entrance to the room from the free part of the building, and to gain it one must pass through the storekeeper's office.

Article 969 of the treasury regulations is as follows: "An office for the accommodation of the owner or occupant may be allowed in warehouses, but such office must be separated by a partition from the rest of the premises, so that the owner shall have no access to the goods; except in presence of the officer, who must be allowed such use of the office as may be necessary for him in connection with his duties." Gleason testified in respect to the piling of the teas: "I simply directed them to be put in the bonded part, and I had sole charge there. Nobody could go in, except when I opened the doors. None of the employees of the govern-

Reed v. Manierre.

ment could get in unless I let them.   I received the goods, as the government employee, and receipted for them.   The government storekeeper is the custodian of the teas received. It was my business to watch the door between the bonded and free parts, and see who went in and came out."   It ap-

pears from the evidence that the teas, when received by the storekeeper, were piled by appellee's employees, but when they were piled does not appear.   After the tea was piled, it was weighed by the government employees, who weighed a certain percentage of it, as a criterion of the entire weight. The first floor was very dark, no natural light having access to it.   Section 972 of the treasury regulations is as follows:   "Fires shall not be permitted in any warehouse, except in the business office, and where lights are required

safety lanterns must be used, unless electric lights are specially authorized by the department and approved by the sureties on the bond." It will be observed that the section does not provide by whom the lanterns shall be furnished, but the uncontradicted evidence is that appellee kept on hand eighteen or twenty lanterns, and that any one employed in the warehouse could have as many of them as he needed, for the asking.

On the morning of the accident Robert J. Sinnott, the government weigher, and John J. Hanrahan and appellant, who were his assistant weighers, entered upon the first floor, passing through the storekeeper's office, he being in the office. They had procured two lanterns, one of which was carried by Hanrahan and the other by Sinnott. When they got onto the floor they went directly west through the alley, or aisle, shown at the north end of the diagram, and then south about 40 feet in the aisle at the west side of the diagram, where they worked weighing tea until about noon of the day. At noon they left one lantern at the tea pile where they had been working, and the other in the aisle running west from the entrance to the floor, both lanterns lighted. They took their lunch in the storekeeper's office. After Hanrahan had taken his lunch, he said to appellant, Reed: "I am going into the bonded department and fix up those teas; you sit here until you finish your smoke." Hanrahan testified that, when he went back there was no light in the aisle running west from the entrance, but that the door leading into the aisle from the free part showed a little light, and when he got to the end of the north and south aisle down which the lamp was burning, near the tea pile, he could see it, and that the next thing which happened, he heard Reed call, "Hello, John," and next he knew Reed had fallen into the elevator shaft, by hearing a groan and his voice, which came from the shaft, and that he took the lamp which he had been using and went, first, to the shaft, and thence to Gleason's office. Gleason and Hanrahan then went to the shaft, found the door open, went down in the elevator part of the way, and Gleason, who had the key of

Reed v. Manierre.

the basement door of the elevator, unlocked the door, and they found appellant under the elevator, groaning and apparently unconscious. The elevator had not been used that day, and Gleason, Hanrahan, Sinnott and appellant each testified that he did not leave the elevator door open, and Gleason testified that, during the noon hour, he did not see any employee of appellee go into the bonded part, and that no employee of appellee could go in unless he let him. Reed, a little time after Hanrahan went into the bonded part from the storekeeper's office, followed him. He testified that there were no lights, and he looked around to ascertain whether he could see, and he went and navigated his way; that after he got inside the door, he turned south to see if he could find a light, and that was the last he knew. The evidence shows that, instead of returning by the route which he had taken from the tea piles where he had been working, to the storekeeper's office, he turned into the north and south aisle, at the east side of the room, a few feet from the entrance door, and walked straight south to the elevator door. He testified that, as soon as he got out of the office, he could see that there was no lamp, and that he did not go back and ask for one. Gleason testified that he never knew of any one having any trouble getting a lantern. Hanrahan testified: "We got all the lights we asked for. I could have asked for the lights myself and got them. * * * We could get all the lights we wanted." Gleason testified that Reed had been working each alternate month at that warehouse, for some time.

We think the jury were fully warranted by the evidence in finding for the defendant. We find no evidence of any negligence on the part of the appellee or his servants. There is no evidence as to when the goods on the first floor were piled, or when appellee, or any of his employees, was on that floor, or when any of his employees used the elevator in the bonded part, if at all. Gleason testified that the elevator was scarcely ever used, and that to unlock the basement door of the elevator, one had to go down from the bonded part and unlock it, and he, Gleason, kept the key; that the door was

locked by an iron strip passed through a staple, and a pad-
lock put through the staple and locked to the staple. Ap-
pellee testified that the elevator door could only be opened
with a key, from the inside; that the storekeeper had pos-
session of the key, and that he, appellee, had no key to the
door. The doors on all the floors, except the first, being
fastened by iron bars in the inside, no one could get onto
one of these floors from the basement of the building. Han-
rahan testified: "Once in a while we used the elevator on
the bonded side, and the other employees would do so too.
When we used the elevators the men belonging to the ware-
house operated them." The word "elevators" is used because
there was an elevator on the first side of the iron partition.
Sinnott, the weigher, testified: "The bonded elevator was
not used very often. When we used the bonded one, we
had to run it ourselves." Gleason, the storekeeper, testified
that he had sole control of the bonded part, in which the
elevator in question was, and that nobody could get in there,
except he opened the doors, that the only way the bonded
part could be entered was through the door in front of his
office.

There is not a particle of evidence when or by whom the
elevator was last used before the accident.

Another question is whether the appellant exercised ordi-
nary care, or whether, on the contrary, he was guilty of
negligence which materially contributed to the accident. He
had been employed on the first floor during each alternate
month for some time prior to the accident, and must have
known of the darkness of the room, and the necessity of arti-
ficial light to make his way in it and to do his work. He
knew when he entered the room from the storekeeper's office,
after taking his lunch, that the lantern which had been
left in the aisle running west from the office was gone or
extinguished. He must have known that he could have a
lantern by merely asking for it. His two companions, Han-
rahan and Sinnott, got two that morning. Yet he risked
proceeding in the dark, navigated his way, as he testified.
He did not even go the way he had come from his work to

the storekeeper's office, which was a safe way, and which Hanrahan took, in returning to his work, and of which Hanrahan says, "I found my way all right." Appellant turned into the north and south alley, which was within a very few feet of the door through which he entered, walked south and fell into the elevator shaft. Under the circumstances stated, no fair minded, reasonable jury could have done otherwise than find for the defendant.

Appellant's counsel contend that there is error in each of the following instructions given at appellee's request:

"8. The court instructs the jury that as a matter of law under the evidence in this case, William R. Manierre and Thomas Reed did not stand in the relation of master and servant, and the said Manierre did not owe to the said Reed a master's duty to furnish a reasonably safe place for a servant to work in."

"19. The court instructs the jury that, if you believe from the evidence that the United States Government, under the bond and regulations, by virtue of which it occupied the bonded part of the warehouse in question, had exclusive possession, control and management of divers operations and conditions within said bonded part, then the defendant William R. Manierre cannot be held liable to the plaintiff solely on account of negligence, if any, in the control and management of the operations and conditions so under the control and management of the United States Government, nor is the defendant William R. Manierre liable to the plaintiff for the consequence of any negligence, if any, on the part of any agent, officer or employee of the United States Government."

The objection urged to instruction 8 is, that it is misleading, as being calculated to create in the minds of the jury the impression that appellee owed no duty to the appellant, in respect to the safety of the first floor. We are inclined to think this objection sound, and that, if the case were a close one on the evidence, it might, perhaps, be ground for reversal.

The objection to instruction 19 is that it assumes that the

government occupied the bonded part of the warehouse. The evidence is conclusive and uncontroverted that the government occupied that part of the warehouse. Therefore the assuming this was not error.

But, we are of opinion that there was no material evidence tending to prove negligence on the part of appellee, as averred, and that, in view of the circumstances heretofore stated, the appellant was guilty of negligence, as matter of law, in the absence of which the accident would not have occurred. Kammerer v. Gallagher, 58 Ill. App., 561; Swift & Co. v. McInerny, 90 ib., 294; Bentley v. Lovelock, 102 ib., 166; C. M. & St. P. Ry. Co. v. Halsey, 133 Ill., 248, 254; Jorgensen v. Johnson Chair Co., 169 ib., 429; Piper v. R. R. Co., 156 N. Y., 225; Brugher v. Buchtenkirch, 60 N. E. R. (N. Y.), 420.

A necessary corollary from these conclusions is, that error in the instructions, if any, is immaterial.

The judgment will be affirmed.

*Affirmed.*